[No. 75715-1. En Banc.]
Argued June 7, 2005. Decided December 15, 2005.

THE STATE OF WASHINGTON, *Respondent*, v. TINA L. KLEIN, *Petitioner.*

104

*Brett W. Ballew*, for petitioner.

*H. Steward Menefee, Prosecuting Attorney*, and *Gerald R. Fuller, Deputy*, for respondent.

*Donna L. Wise* on behalf of Washington Association of Prosecuting Attorneys, amicus curiae.

¶1 J.M. JOHNSON, J. — The Court of Appeals affirmed the denial of Tina Klein's petition for full release from the custody of the Department of Social and Health Services. Custody was imposed after Klein violated the terms and conditions of her release following a 1993 acquittal on criminal charges by reason of insanity. Klein now asserts that the Court of Appeals erred in upholding the trial court's findings that she continues to (1) suffer from a mental disease or defect and (2) pose a substantial danger to others or a substantial likelihood of committing criminal acts jeopardizing public safety. For the reasons stated herein, we affirm.

FACTS AND PROCEDURAL HISTORY

¶2 Tina Klein has abused alcohol and illegal narcotics since adolescence. In January 1993, at age 21, Klein received an insurance settlement from an automobile accident and used the proceeds to support her long-standing cocaine addiction. Although Klein discontinued her use of cocaine in March of that year, her behavior during the ensuing months was described by others as "bizarre," Clerk's Papers (CP) at 3, "crazy," CP at 6, and "weird." CP at 7.

¶3 On April 20, 1993, during a psychotic episode, Klein stabbed her 20-month-old nephew in the back with an eight-inch butcher knife while he was sleeping. During this same episode, Klein also attempted to stab the victim's

parents, who successfully intervened to save their child's life. Klein was subsequently charged with assault of a child in the first degree, *see* RCW 9A.36.120, and underwent psychological evaluation at Western State Hospital (Western State).[1]

¶4 Klein was diagnosed by Dr. Murray Hart, a state psychologist, as suffering from a "psychoactive substance induced organic mental disorder"[2] at the time of the stabbing. CP at 35. Dr. Brett C. Trowbridge of Olympia also evaluated Klein and apparently concurred with Dr. Hart's conclusions.

¶5 On August 12, 1993, based upon a stipulation between the parties as to the evidence and the psychological evaluations, Judge Gordon Godfrey of the Grays Harbor County Superior Court entered a judgment of acquittal by reason of insanity and conditionally released Klein. The terms and conditions of release included, among others, that Klein (1) commit no criminal law violations; (2) refrain from consuming or possessing alcohol or controlled substances; (3) report monthly to a community corrections officer with the Department of Corrections, including submission to random urinalysis at his or her discretion; (4) enter into and complete a program of mental health, alcohol, and drug treatment; and (5) enroll in the mentally ill offender program at Western State for periodic psychiatric and psychological monitoring.

---

[1] Western State is a state-owned psychiatric hospital that "handl[es] the most complicated long-term care needs of patients with a primary diagnosis of mental disorder." RCW 72.23.025(1). The hospital is administered by the Department of Social and Health Services, RCW 72.01.050(1), and is located at Fort Steilacoom, Pierce County, RCW 72.23.020.

[2] The record also refers to Klein's original diagnosis as a "cocaine-induced delusional disorder." Verbatim Report of Proceedings (May 21, 2003) at 7. The evaluations that formed the basis of Klein's original acquittal are not included in the record, however.

According to the edition of the American Psychiatric Association's diagnostic manual that was current at the time of Klein's original diagnosis, a psychoactive substance-induced organic mental disorder is "caused by the direct effects of various psychoactive substances on the nervous system." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-III-R 123 (3d rev. ed. 1987).

¶6 Klein subsequently violated the terms and conditions of her release on numerous occasions by abusing drugs, including methamphetamine and marijuana, and by failing to report to her probation officers. During this period, Klein admitted to using methamphetamine on a daily basis and to heavy abuse of alcohol. According to her probation officers, Klein "was not focused on her recovery and her prognosis was poor." Suppl. CP at 24. She also "abscond[ed] supervision when using controlled substances." Suppl. CP at 24, 27. These same officers also discovered that Klein was babysitting several small children, thereby raising concerns of a repeat in violent behavior.

¶7 While on conditional release, Klein was rehospitalized at Western State on three separate occasions, all due to violations of her conditional release. The trial court ordered Klein to be evaluated at Western State. The court ultimately revoked Klein's conditional release, and she was admitted to Western State for the final time on November 27, 2001.

¶8 During a trial court hearing on May 30, 2002, Klein requested a transfer from Western State to an inpatient drug and alcohol treatment program. Western State staff, including psychologist Dr. Alton Couturier, voiced concern with the request in light of Klein's repeated inability to profit from drug and alcohol programs and her lack of commitment to treatment. Instead, they recommended that if Klein demonstrated the requisite improvement and commitment, she could then transition to the community on an outpatient basis while residing at the hospital. Judge Godfrey of the Grays Harbor County Superior Court, the same judge who entered Klein's original acquittal, ordered Klein to remain at Western State for further psychological evaluation.

¶9 On February 26, 2003, Dr. Couturier submitted an evaluation to the trial court in order to comply with Western State's obligation under the terms of Klein's conditional release to keep the court informed of Klein's progress. Although Klein had exhibited moderate progress,

the evaluation cautioned that she "has always had the ability to exhibit suitable adjustment in the short-term, but her ability to sustain an effective adjustment remains the issue." CP at 22. The report contained, in part, the following diagnosis:

Axis I:[3] Polysubstance Dependence, in Full Sustained Remission in a Controlled Environment;[4]

Axis II: Personality Disorder NOS [not otherwise specified], with borderline, antisocial, and passive-aggressive features.[5]

CP at 22.

¶10 On April 11, 2003, Klein petitioned for an order granting full release from the custody of the Department of Social and Health Services pursuant to RCW 10.77.200(3). The petition asserted that Klein no longer suffered from a mental disease or defect because her polysubstance dependence was "in remission."[6] CP at 19-20. The petition also cited *State v. Reid*, 144 Wn.2d 621, 30 P.3d 465 (2001), as

---

[3] A multiaxial evaluation assesses an individual's mental health on several axes, each of which refers to a different class of information. *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-IV-TR 27 (4th rev. ed. 2000) (DSM-IV-TR). Clinical disorders are reported on Axis I, *id.* at 27-28, and personality disorders and mental retardation on Axis II. *Id.* at 28-29.

[4] "Polysubstance dependence" is a disorder exhibited by repeated use during a 12-month period of at least three groups of substances (not including caffeine and nicotine), but no single substance predominated. *Id.* at 293. This disorder is in "sustained full remission" if none of the criteria for dependence or abuse have been met at any time during a period of 12 months or longer. *Id.* at 196. The remission is attributable to a "controlled environment" if access to alcohol and controlled substances is restricted (e.g., prison, therapeutic community, or locked hospital unit), and no criteria for dependence or abuse have been met for at least the past month. *Id.* at 197.

[5] A "personality disorder not otherwise specified" is exhibited where the individual's personality pattern meets the general criteria for a personality disorder and traits of several different personality disorders are present, but the criteria for any specific personality disorder are not met. *Id.* at 685. A "borderline" trait consists of a pervasive pattern of instability of interpersonal relationships, self-image, affects, and marked impulsivity. *Id.* at 706-10. An "anti-social" trait consists of a pervasive pattern of disregard for, and violation of, the rights of others. *Id.* at 701. Finally, a "passive-aggressive" trait consists of a pervasive pattern of negativistic attitudes and passive resistance to authority. *Id.* at 789.

[6] At oral argument, Klein's counsel also took the position that Klein did not suffer from the identical "mental disease or defect" as the original diagnosis that formed the basis of the underlying acquittal.

mandating unconditional release when an insanity acquittee no longer suffers from a mental disease or defect.

¶11 At the hearing on the merits of the petition, the State called Dr. Couturier as a witness. In preparation for his testimony, Dr. Couturier conducted a 10-hour, in-depth interview of Klein over the course of seven days. He also reviewed Klein's medical records and administered a psychopathy checklist.

¶12 Dr. Couturier testified that Klein still suffered from a mental disorder, specifically the same diagnosis of polysubstance dependence and personality disorder not otherwise specified as included in his February 26, 2003 letter to the court. He explained that these disorders were "interactive." Verbatim Report of Proceedings (VRP) (May 21, 2003) at 9. In other words, between Klein's Axis I and Axis II diagnoses, she could not absorb the therapy that she was receiving, and she did not have the skills to recover on her own.

¶13 Dr. Couturier testified that the polysubstance dependence included the abuse of cocaine, methamphetamine, marijuana, and alcohol, and that it was "in remission" only because Klein was currently in the "controlled environment" and "artificial setting" of Western State. *Id.* at 8. In the event these external controls were released, Dr. Couturier believed that Klein would return to the same risky behavior, as evidenced by her repeated relapses while on conditional release. *Id.* Dr. Couturier also explained that a disorder that is in remission in a controlled environment "is not gone." *Id.* at 9. He stated that there are recognized provisions for recovery, but that Klein did not exhibit them.

¶14 With respect to Klein's danger to the community, Dr. Couturier reasoned that in light of her current diagnosis and the prior psychotic episode, if she resumed drug use upon her release, there was a "substantially enhanced chance" that she would engage in violent behavior. *Id.* at 10. He later testified that Klein posed a "moderate risk" to reoffend, but qualified the statement that if she continued

to use alcohol or illegal narcotics, her risk of experiencing another psychotic episode was "rather high," and her risk of reoffending would be "much higher than the average individual." VRP (June 25, 2003) at 32.

¶15 Dr. Brett Trowbridge was called by counsel for Klein to rebut the testimony of Dr. Couturier. Dr. Trowbridge actually agreed with Dr. Couturier's diagnosis of polysubstance dependence and a personality disorder not otherwise specified but asserted that the current diagnosis did not legally constitute a "mental disease or defect" based upon his interpretation of *Reid*. He did not offer any specific definition of the term. He also testified that Klein no longer suffered from the original drug-induced psychosis that formed the basis of Klein's acquittal.

¶16 With respect to Klein's danger to the community, Dr. Trowbridge conceded that individuals with personality disorders were more likely to commit a crime than someone without such a disorder. He also confirmed that individuals with chemical dependency in remission, such as Klein, are more likely to "get into trouble" if they return to using drugs. VRP (June 25, 2003) at 8. Finally, he assessed Klein with a "[m]id-range" probability for experiencing another drug induced psychotic episode if she returned to drug use. *Id.* at 19. Because there were no reports of Klein experiencing psychotic episodes or committing any additional violent offenses while on conditional release, notwithstanding her drug use, Dr. Trowbridge testified that she was in the low to moderate range for reoffending.

¶17 On June 25, 2003, the trial court denied Klein's request for full release. The court's order consisted in its entirety of two findings of fact and no conclusions of law:

1. The defendant continues to suffer from mental disease or defect. The Court accepts the current diagnosis as set forth by Dr. Alton Couturier in his evaluation of February 26, 2003.

2. Taking into account the circumstances of the original offense, the defendant's continuing drug dependency, the defendant's present mental state, and the risk assessment prepared by Dr. Couturier, the Court finds that the defendant remains a

substantial danger to others and presents a substantial likelihood of committing criminal acts jeopardizing the public safety, as a consequence of her mental disorder.

CP at 40-41.

¶18 Klein appealed both of the findings in the trial court's order. With respect to the first finding, she argued that polysubstance dependence is not a "mental disease or defect" under RCW 10.77.200(3) and that even if it is, the petition must still be granted because polysubstance dependence is not the same mental disease or defect that formed the basis of her original acquittal. With respect to the second finding, Klein argued that the evidence established that she posed only a "moderate" risk to reoffend and not a "substantial" risk as required under RCW 10.77.200(3).

¶19 The Court of Appeals affirmed the denial of Klein's petition for release, holding that substantial evidence in the record supported both of the trial court's findings. *See State v. Klein,* noted at 122 Wn. App. 1002 (2004). The court also held that RCW 10.77.200(3) did not require the trial court to find that Klein no longer suffered from the same mental disease or defect that had justified her acquittal by reason of insanity. Klein successfully sought our discretionary review.

ISSUES

¶20 1. Does substantial evidence in the record support the trial court's finding that Klein continues to suffer from a "mental disease or defect"?

¶21 2. If insanity acquittees suffer from a different "mental disease or defect" than the one that formed the basis of their acquittal, must they be unconditionally released?

¶22 3. Does substantial evidence in the record support the trial court's finding that Klein presents a substantial danger to other persons, or a substantial likelihood of committing criminal acts jeopardizing public safety or se-

curity, unless kept under further control by the court or other persons or institutions?

## I. Definition of "Mental Disease or Defect"

¶23 Klein challenges the trial court's finding that she continues to suffer from a "mental disease or defect." Under our current statutory scheme, the presence of a mental disease or defect is a requirement for asserting the insanity defense. RCW 9A.12.010. Conversely, the absence of such a condition is the threshold inquiry when an insanity acquittee petitions for full release from state commitment. RCW 10.77.200(2). Neither the legislature nor this court has defined the term in either context.

¶24 Washington follows the *M'Naghten* rule (*M'Naghten's Case*, 10 Clark & Fin. 200, 210, 8 Eng. Rep. 718, 722 (H.L. 1843)) for determining insanity, which has been codified at RCW 9A.12.010. *See, e.g., State v. Wheaton*, 121 Wn.2d 347, 352 n.2, 850 P.2d 507 (1993); *Allstate Ins. Co. v. Raynor*, 143 Wn.2d 469, 475 n.3, 21 P.3d 707 (2001) (citing *M'Naghten's*).

¶25 To establish the defense of insanity, it must be shown that:

> (1) At the time of the commission of the offense, *as a result of mental disease or defect*, the mind of the actor was affected to such an extent that:
>
> (a) He was unable to perceive the nature and quality of the act with which he is charged; or
>
> (b) He was unable to tell right from wrong with reference to the particular act charged.
>
> (2) The defense of insanity must be established by a preponderance of the evidence.

RCW 9A.12.010 (emphasis added). Although the presence of a "mental disease or defect" is necessary to establish the defense, it has only been on rare occasion that we have

ascribed the term any significant independent meaning. *See State v. Crenshaw*, 98 Wn.2d 789, 800, 659 P.2d 488 (1983).

■ ¶26 An individual who is acquitted under our insanity defense statute will rarely be unconditionally released immediately, however, because "Washington law since 1905 has presumed the mental condition of a person acquitted by reason of insanity continues and the burden rests with that individual to prove otherwise." *State v. Platt*, 143 Wn.2d 242, 251 n.4, 19 P.3d 412 (2001) (citing *In re Habeas Corpus of Brown*, 39 Wash. 160, 166, 81 P. 552 (1905); *State v. Blubaugh*, 80 Wn.2d 28, 36, 491 P.2d 646 (1971); *Soderquist v. Keller*, 21 Wn.2d 1, 10-11, 149 P.2d 528 (1944)). Accordingly, the typical insanity acquittee is subjected to state custody in the form of commitment or conditional release. *See* RCW 10.77.150(1), .200.

■ ¶27 While subject to state custody, an insanity acquittee may petition the courts at any time for full release. *See Reid*, 144 Wn.2d at 629. The legal standards governing the disposition of such petitions are set forth in RCW 10.77.200(2) and (3):

> The burden of proof shall be upon the petitioner to show by a preponderance of the evidence that the petitioner no longer presents, *as a result of a mental disease or defect*, a substantial danger to other persons, or a substantial likelihood of committing criminal acts jeopardizing public safety or security, unless kept under further control by the court or other persons or institutions.

RCW 10.77.200(2) (emphasis omitted). We have construed this statute to mean that a petitioner must be discharged if it is demonstrated that he or she no longer suffers from a "mental disease or defect," notwithstanding any potential danger to the community. *See Reid*, 144 Wn.2d at 630.

¶28 Here, as previously stated, the parties' respective psychologist experts agreed as to Klein's current diagnosis, including the presence of various recognized mental disorders. However, counsel disagreed as to whether such disorders legally constituted a "mental disease or defect" under

RCW 10.77.200.[7] *See, e.g.*, Br. of Appellant at 4-5; Br. of Resp't at 2.

¶29 Klein argues that her release is mandated under *Reid*. In *Reid*, an insanity acquittee petitioned for release from custody after approximately four years of commitment at Western State. 144 Wn.2d at 624. The original acquittal stemmed from an episode in which Reid ingested hallucinogenic drugs and shot and killed his roommate. *Id.* at 623. In support of Reid's petition for release, two experts, including the State's, testified that Reid no longer suffered from *any* mental disease or defect. *Id.* at 625. In fact, one even testified that there had been a "100 percent reversal" since Reid's initial commitment. *Id.* Because it was unanimously agreed that Reid did not suffer from a mental disease or defect, this court never defined the term. In the present case, however, there is a dispute over whether Klein has a mental disease or defect, and the trial court held that she did. Thus, *Reid* is not controlling here.

■ ¶30 The determination of whether Klein continues to suffer from a mental disease or defect is a question of fact. *See id.* at 631. *Cf. State v. Sommerville*, 111 Wn.2d 524, 533, 760 P.2d 932 (1988) (holding that motion for acquittal by reason of insanity should be decided by trial court as a question of fact). We review disputed findings of fact under a substantial evidence standard. *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999). Evidence is substantial if it is sufficient to convince a reasonable person of the truth of the finding. *Id.* Where substantial evidence supports challenged facts, those facts as found by the trial court are binding on appeal. *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

---

[7] In addition to counsel, Drs. Couturier and Trowbridge also appeared to disagree as to whether Klein continues to suffer from a "mental disease or defect." For example, Dr. Trowbridge testified that Klein's condition was not a mental disease or defect according to his interpretation of *Reid*, 144 Wn.2d 621. However, we do not defer to psychologists on the interpretation of the law, especially where the legal term in question is not synonymous with a term of art in the relevant scientific community. To do so would conflate the *factual* determination of polysubstance dependence and personality disorder with the *legal conclusion* of mental disease or defect under the statute.

■ ■ ¶31 Although the ultimate determination of the existence of a mental disease of defect is a question of fact, the absence of a statutory definition has invited confusion. When a statute fails to define a term, a court may rely on the ordinary meaning of the word as stated in a dictionary. *See Budget Rent A Car Corp. v. Dep't of Licensing*, 144 Wn.2d 889, 899, 31 P.3d 1174 (2001). Additionally, the plain meaning of a statute may be determined from related statutes that disclose legislative intent about the provision at issue. *See State v. C.G.*, 150 Wn.2d 604, 609, 80 P.3d 594 (2003).

■ ¶32 The dictionary indicates that the term "mental disease or defect" has the common meaning of "mental disorder." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1411 (2002) (defining "mental disease" as a "disease characterized esp. by mental symptoms : mental disorder"). Similarly, we have previously recognized that the terms "mentally ill" and "mentally disordered" are interchangeable. *See In re Pers. Restraint of Young*, 122 Wn.2d 1, 27 n.3, 857 P.2d 989 (1993). *Cf.* BLACK'S LAW DICTIONARY 1007 (8th ed. 2004) (defining "mental illness" as a "mental disorder in thought or mood so substantial that it impairs judgment, behavior, perceptions of reality, or the ability to cope with the ordinary demands of life").

■ ¶33 Although our legislature has not further defined the term "mental disease or defect," other state legislatures have. In doing so, these legislatures have exercised a legislative prerogative to depart from a dictionary definition and have instead made policy choices to exclude specific types of mental conditions from the term.[8] Were we

---

[8] *See, e.g.,* ALASKA STAT. § 12.47.130 (2005) (" 'Mental disease or defect' means a disorder of thought or mood that substantially impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life; 'mental disease or defect' also includes mental retardation, which means a significantly below average general intellectual functioning that impairs a person's ability to adapt to or cope with the ordinary demands of life."); COLO. REV. STAT. § 16-8-101.5(2)(b) (2005) (" 'Mental disease or defect includes only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality and that are not attributable to the voluntary ingestion of alcohol or any other psychoactive substance but does

to do so here by court decision, we would unduly encroach upon the legislative function, especially since our legislature has not seen fit to further define the term.

 ¶34 The American Psychiatric Association publishes the *Diagnostic and Statistical Manual of Mental Disorders* (DSM), which is a compilation of mental disorders that " 'reflect[s] a consensus of current formulations of evolving knowledge' in the mental health field." *State v. Greene*, 139 Wn.2d 64, 71, 984 P.2d 1024 (1999) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-IV-TR at xxvii (4th rev. ed. 2000)). We have relied on the DSM in a variety of contexts. *See, e.g.*, *In re Disability Proceeding Against Diamondstone*, 153 Wn.2d 430, 105 P.3d 1 (2005); *Braam v. State*, 150 Wn.2d 689, 694 n.1, 81 P.3d 851 (2003); *In re Petition of Campbell*, 143 Wn.2d 504, 506, 21 P.3d 1147 (2001).

¶35 However, in recognizing the term "mental disease or defect" often is synonymous with the term "disorder," we reiterate our prior caveat that " '[t]he *DSM* is, after all, an evolving and imperfect document [and it is not] sacrosanct.' " *In re Pers. Restraint of Young*, 122 Wn.2d at 28 (quoting Alexander D. Brooks, *The Constitutionality and Morality of Civilly Committing Violent Sexual Predators*, 15 U. PUGET SOUND L. REV. 709, 733 (1991-1992)). Not all disorders defined therein will rise to the status of "disease or defect" under our statutes.

¶36 Our state's practice of conducting *Frye* hearings (*Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923)) if individuals assert insanity defenses based on disorders of dubious repute in the legal or scientific communities assures that the DSM does not become the de facto definition of mental disease or defect. *See generally Greene*, 139 Wn.2d 64; *State v. Wheaton*, 121 Wn.2d 347, 850 P.2d 507 (1993). The DSM is updated periodically and

not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.' "); OR. REV. STAT. § 161.295(2) (2005) ("the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder").

recognizes that "[n]ew knowledge generated by research or clinical experience will undoubtedly lead to an increased understanding of the disorders included in DSM-IV, to the identification of new disorders, and to the removal of some disorders in future classifications." DSM-IV-TR at xxxiii.

¶37 In addition to *Frye*, ER 702 continues to control trial court analysis for both the insanity defense and application of the release statute. RCW 10.77.200. Expert evidence relating to a mental disease or defect (or "disorder") that does not help the trier of fact is inadmissible.

¶38 While the definition of mental disease or defect is admittedly broad, we do not expect that it will demonstrably alter the historic application of our statutory scheme. Under our insanity defense statute, for example, the inquiries into the individual's capacity to perceive the nature and quality of the act and tell right from wrong have always been, and will continue to be, the primary factors that limit the availability of the insanity defense to those who should not be culpable in the eyes of the law. Indeed, the DSM undoubtedly contains mental disorders that do not prevent individuals from perceiving the nature and quality of their acts or telling right from wrong.

¶39 Because of the statutory presumption that an insanity acquittee continues to be insane, the primary inquiry for the release statute remains the dangerousness of the individual. The DSM undoubtedly contains many mental disorders that do not manifest themselves by dangerous behavior and therefore cannot support continued custody. Similarly, there are conditions which impair the ability to cope with the ordinary demands of life which do not manifest themselves by dangerous behavior.

¶40 Finally, Klein argues that a mental condition that is in remission is not a disease or defect. We disagree, as did the trial court and the Court of Appeals. A finding that a mental disease or defect is in remission does not preclude a finding that the person continues to suffer from the condition and requires further detention. Under the DSM, a diagnosis "in full remission" is appropriate for those

individuals who no longer demonstrate any symptoms or signs of a disorder, but for which there is still clinical relevance in noting the disorder. DSM-IV-TR at 2. For example, Dr. Couturier testified that Klein's disorder is in remission only because she is being maintained in a wholly artificial setting with controls. The DSM has criteria for full recovery. *See generally Reid*, 144 Wn.2d 621. Klein did not meet those criteria. Accordingly, substantial evidence on the record indicates that Klein continues to suffer from a "mental disease or defect."

II. Different "Mental Disease or Defect" than Acquittal

¶41 Klein alternatively argues that even if she continues to suffer from a mental disease or defect, she must nonetheless be released because she no longer suffers from the same mental disease or defect that justified her original acquittal. We reject this assertion.

¶42 An insanity acquittee must be released if it is demonstrated by a preponderance of the evidence that he or she "no longer presents, as a result of *a* mental disease or defect, a substantial danger to other persons, or a substantial likelihood of committing criminal acts jeopardizing public safety or security . . . ." RCW 10.77.200(2) (emphasis added). Use of the indefinite article "a" suggests that the continuation of the same condition that justified the original acquittal is not necessary for continued custody. *Cf. Ruiz-Guzman v. Amvac Chem. Corp.*, 141 Wn.2d 493, 499, 7 P.3d 795 (2000) (" '[b]y using the indefinite article "a" rather than the definite article "the" . . . the Act, read literally, permits reliance on the existence or feasibility of a product different from the challenged product to establish . . . that the challenged product is "not reasonably safe." ' " (emphasis omitted) (alteration in original) (quoting Opening Br. of Pls.-Appellants at 8.)).

¶43 It does not follow, however, that *any* mental disease or defect is sufficient to justify continued custody. Rather, "[d]ue process requires that the nature of commitment bear some reasonable relation to the purpose for which the in-

dividual is committed." *Foucha v. Louisiana*, 504 U.S. 71, 79, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) (citing *Jones v. United States*, 463 U.S. 354, 368, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983)). Undoubtedly, a reasonable relation exists between Klein's original diagnosis of "psychoactive substance-induced organic mental disorder" (also referred to as a "cocaine-induced delusional disorder") and the current diagnosis of polysubstance dependence, both of which derive from Klein's continued addiction to controlled substances.

¶44 Our conclusion is also strengthened by the fact that "[t]he purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness." *Jones*, 463 U.S. at 368. If our sole inquiry focused on whether the release candidate continued to suffer from the exact same condition, one of the central purposes of commitment, the protection of society, could be undermined. For it is quite conceivable that an insanity acquittee could "partially recover" from the originally diagnosed condition, yet maintain a related condition that manifests itself in equally dangerous behavior.

¶45 In addition, Klein's construction of the statute would require difficult, if not impossible, comparisons between the original and present mental conditions of an acquittee. The feasibility of such comparisons is doubtful in light of the

> "uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment."

*Jones*, 463 U.S. at 365 n.13 (quoting *Greenwood v. United States*, 350 U.S. 366, 375, 76 S. Ct. 410, 100 L. Ed. 412 (1956)). The DSM-IV-TR candidly acknowledges, for example, that each category of mental disorder is not a completely discrete entity. DSM-IV-TR at xxx. In other words, the subjective and evolving nature of psychology may lead to different diagnoses that are based on the very

same symptoms, yet differ only in the name attached to it.[9] Construing RCW 10.77.200 to mandate release based on mere semantics would lead to absurd results and risks to the patient and public beyond those intended by the legislature. We decline to substitute our judgment for that legislative determination.

## III. Substantial Danger or Likelihood of Committing Criminal Acts Jeopardizing Public Safety

¶46 Finally, Klein argues that the trial court erred in finding that she continues to present a substantial danger to others or a substantial likelihood of committing criminal acts jeopardizing public safety. We hold that substantial evidence in the record supports the trial court's finding.

▆▆▆▆ ¶47 An insanity acquittee must be released if he or she is no longer dangerous, regardless of the presence of a mental disease or defect. *See O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975) ("A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement . . . . [T]here is no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom."). *Accord Reid*, 144 Wn.2d at 630 n.3 (quoting *O'Connor*, 422 U.S. at 575 and *Foucha*, 504 U.S. at 77).

¶48 The determination that an individual remains a danger to the public is a question of fact. We generally do not substitute our judgment for that of the trier of fact regarding issues of conflicting expert testimony. *See State v.*

---

[9] Notably, Klein's expert, Dr. Trowbridge, testified to the same problem.

Q. [T]wo different psychologists may have two different opinions; both of which to them may be equally valid?

A. Yes.

Q. Based on equally valid considerations.

A. Yes. I think that's right.

VRP (June 25, 2003) at 23.

*Stenson*, 132 Wn.2d 668, 718, 940 P.2d 1239 (1997) (citing *State v. Benn*, 120 Wn.2d 631, 662, 845 P.2d 289 (1993)).

¶49 Klein argues that there is insufficient evidence on the record that she remains a substantial danger to the public. Yet, this assertion misstates the burden of proof under the statute. Under RCW 10.77.200(2) and (3), the burden of proof is on Klein to show by a preponderance of the evidence that she no longer presents a substantial danger to others. On this record, Klein failed to do so.

¶50 Dr. Couturier testified that Klein presented a substantial danger, especially if she returned to the use of controlled substances.

> Q. Secondly, is she a substantial danger, in your opinion, to other persons or does she present a substantial likelihood of committing criminal acts jeopardizing public safety or security unless kept under further control?
>
> A. I do believe that she does . . . . Does she represent a danger? If she returns to the use of methamphetamine, which is very likely, or cocaine—because I don't think her controls are nearly as good as she'd like us to believe—there's a substantially enhanced chance of having violent behavior.

VRP (May 21, 2003) at 10. *See also id.* at 9 ("there's an enhanced opportunity, chance, likelihood, of violent behavior"); *id.* at 12 ("Using chemicals in the amounts that she was using and reported to us, there's an enhanced chance that she's going to re-offend in some way.").

¶51 Klein argues that the testimony of both Dr. Couturier and Dr. Trowbridge establishes only that she is a "moderate" risk to others, which falls short of the "substantial danger" requirement in the statute. *See* Br. of Appellant at 7 (referencing dictionary definition of "moderate" as "average means or extent"). Klein appears to base this on some testimony in which she was considered a "moderate" risk to reoffend. *See* VRP (June 25, 2003) at 13, 32.

¶52 However, this argument is unpersuasive for two reasons. First, it overlooks statements by both experts that indicated that Klein did pose a substantial danger if she

returned to using drugs (as she had on numerous occasions previously).

¶53 Second, there is no indication that the statements of moderate risk were made in connection with the statutory standard. For example, although Dr. Couturier used the term "moderate" to describe Klein's danger, he clarified that "moderate" meant "much higher than the average individual." VRP (June 25, 2003) at 32.

¶54 In light of this potentially conflicting expert testimony, we defer to the trial court's discretion on which expert to believe. The trial court judge specifically accepted the risk assessment prepared by Dr. Couturier. Substantial evidence in the record supports the trial court's conclusion that Klein posed a substantial danger.

CONCLUSION

¶55 Klein's diagnosis of polysubstance dependence and a personality disorder not otherwise specified constitute a mental disease or defect for purposes of RCW 10.77.200. Moreover, the plain language of this provision does not require that an insanity acquittee continue to suffer from the same mental disease or defect that formed the basis of the underlying acquittal to justify continued custody, so long as there is a reasonable relation to the purpose for which the individual is committed. A reasonable relation exists between Klein's original diagnosis of psychoactive substance-induced organic mental disorder and the current diagnosis of polysubstance abuse, both of which stem from Klein's long standing addiction to controlled substances. Finally, substantial evidence in the record supports the trial court finding that Klein continues to present a substantial danger to others or a substantial likelihood of committing criminal acts jeopardizing public safety.

¶56 Affirmed.

C. JOHNSON, BRIDGE, CHAMBERS, OWENS, and FAIRHURST, JJ., concur.

124

¶57 SANDERS, J. (dissenting) — The majority holds that Tina Klein is not entitled to release under RCW 10.77.200 because she is dangerous as a result of the "mental disease" of "polysubstance dependence." In short, because she is a drug addict. I disagree. Drug addiction is not a mental disease. And the State cannot hold Klein unless she suffers from a mental disease or defect. Therefore, she is entitled to release.

I. BACKGROUND

¶58 Klein is a longtime drug addict. On April 20, 1993, she stabbed her infant nephew with a butcher knife and was charged with assault of a child in the first degree. On August 12, 1993, the trial court acquitted Klein by reason of insanity, finding a "psychoactive substance induced organic mental disorder," and conditionally released her. Clerk's Papers (CP) at 35. But after repeated violations, the trial court revoked the conditional release and placed Klein in state custody.

¶59 On April 11, 2003, Klein petitioned for full release. The trial court denied her petition, holding that she "remains a substantial danger to others and presents a substantial likelihood of committing criminal acts jeopardizing the public safety" because she suffered from the "mental disease" of "[p]olysubstance [d]ependence." CP at 40-41, 22. In other words, she used several different drugs several times. On appeal, Klein argued, inter alia, that polysubstance dependence is not a "mental disease or defect" under RCW 10.77.200. The Court of Appeals held that it was. *See State v. Klein*, noted at 122 Wn. App. 1002 (2004).

II. KLEIN IS ENTITLED TO RELEASE BECAUSE "POLYSUBSTANCE DEPENDENCE" IS NOT A "MENTAL DISEASE OR DEFECT" UNDER RCW 10.77.200

¶60 Washington law codifies the venerable *M'Naghten* insanity defense (*M'Naghten's Case*, 10 Clark & Fin. 200, 8 Eng. Rep. 718 (H.L. 1843)). Defendants asserting it must

prove that "as a result of mental disease or defect" they were unable either "to perceive the nature and quality of the act" or "to tell right from wrong with reference to the particular act." RCW 9A.12.010; 10.77.080. Success results in acquittal because the defendant lacked the mens rea for the crime. *See State v. Reid*, 144 Wn.2d 621, 627 n.2, 30 P.3d 465 (2001) (citing *Foucha v. Louisiana*, 504 U.S. 71, 76 n.4, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992)).

A. Insanity Acquittees Who Do Not Suffer from a "Mental Disease or Defect" Are Entitled to Release

¶61 Insanity acquittees are subject to state custody if "as a result of a mental disease or defect" they present "a substantial danger to other persons" or "a substantial likelihood of committing criminal acts jeopardizing public safety or security." RCW 10.77.200(3). But they may petition the court for full release at any time. *Id*. And if they no longer suffer from a "mental disease or defect," they are entitled to release. "When an insanity acquittee demonstrates he has regained his sanity, the basis for his confinement in a mental institution vanishes and he must be released." *Reid*, 144 Wn.2d at 631 (construing RCW 10.77-.200) (holding insanity acquittee subject to state custody "so long as he is both mentally ill and dangerous as a result of that mental illness, but no longer"). *See also Foucha*, 504 U.S. at 77 (holding insanity acquittee "may be held as long as he is both mentally ill and dangerous, but no longer").

B. The Majority Errs by Deferring to the DSM-IV[10] Definition of Mental Illness

¶62 The majority correctly recognizes that an insanity acquittee petitioning for release "must be discharged if it is demonstrated that he or she no longer suffers from a 'mental disease or defect.'" Majority at 114. And it correctly recognizes that we must not "conflate the *factual* determi-

---

[10] AM. PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 1994) (DSM-IV).

nation of polysubstance dependence and personality disorder with the *legal conclusion* of mental disease or defect under the statute." Majority at 115 n.7. But unaccountably, it does just that.

¶63 Despite protestations to the contrary, the majority effectively assumes that "polysubstance dependence" is a "mental disease or defect" simply because it appears in the DSM-IV. *See* majority at 117. It concedes that some disorders defined in the DSM-IV will not "rise to the status of 'disease or defect' under our statutes." Majority at 117. But without explanation it concludes that "polysubstance dependence" qualifies. Essentially, its "legal conclusion" relies entirely on the trial court's finding that Klein suffers from a "mental disease or defect." But unfortunately, the majority fails to examine the substance of that finding.

¶64 Whether or not Klein continues to suffer from a "mental disease or defect" is indeed a question of fact. *See* majority at 115. But it is a question of fact the trial court neither asked nor answered. The trial court purported to find the legal fact that Klein "continues to suffer from mental disease or defect." CP at 40. But it actually found only the fact that Klein suffers from "polysubstance dependence." CP at 40, 22.[11] And it simply assumed that because "polysubstance dependence" is a disorder listed in the DSM-IV, it is a "mental disease or defect" under RCW 10-.77.200.[12] But it was wrong.

C. A Medical Diagnosis of Mental Illness Does Not Necessarily Support a Legal Finding of "Mental Disease or Defect"

¶65 Whether or not an insanity acquittee suffers from a "mental disease or defect" is a question of fact. But whether

---

[11] The trial court held in full: "The defendant continues to suffer from mental disease or defect. The Court accepts the current diagnosis as set forth by Dr. Alton Couturier in his evaluation of February 26, 2003." CP at 40.

[12] The trial court found that Klein "suffers from a personality disorder not otherwise defined under DSM 301.90, for which she needs treatment. She has the chemical dependency problems as defined under DSM 305.60 and .70 that she needs treatment." Report of Proceedings (RP) at 40-41. On the basis of those findings, it held that she "still suffers from the mental diseases and defects." RP at 41.

or not "polysubstance dependence"—or any other disorder listed in the DSM-IV—constitutes a "mental disease or defect" is a question of law. "The crux of the issue, then, is not whether the acquittee must be ill in the medical sense, but whether his mental state fits a constitutionally valid legal definition." *Parrish v. Colorado*, 78 F.3d 1473, 1477 (10th Cir. 1996). *See also* Bruce J. Winick, *Ambiguities in the Legal Meaning and Significance of Mental Illness*, 1 PSYCH. PUB. POL. & L. 534, 557 (1995) (under *Foucha*, "what constitutes mental illness for purposes of involuntary hospitalization is a legal rather than a medical question"). Courts must "identify those mental illnesses of the health professionals that have the characteristics of 'illness' that society views as essential to the legal processes." Jules B. Gerard, *The Usefulness of the Medical Model to the Legal System*, 39 RUTGERS L. REV. 377, 396 (1986).

¶66 The DSM-IV is a diagnostic tool, not a legal treatise. "In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a 'mental disorder,' 'mental disability,' 'mental disease,' or 'mental defect.' " DSM-IV-TR[13] at xxxiii. Many of the 374 disorders listed in the DSM-IV are not "mental diseases or defects" in a legal sense. In fact, many are not "illnesses" at all. *See* Gerard, *supra*, at 386 (noting that a diagnosis is not "an 'illness' just because psychiatrists attempt to treat the condition"). *See also Ake v. Oklahoma*, 470 U.S. 68, 81, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985) (noting that "psychiatrists disagree widely and frequently on what constitutes mental illness").

¶67 Courts may find the DSM-IV helpful in construing legal terms like "mental disease or defect." But they must respect the "imperfect fit between the questions of ultimate concern to the law" and the disorders it catalogues. DSM-IV-TR at xxxiii. *See also Kansas v. Hendricks*, 521 U.S. 346, 359, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) ("The legal definitions of 'insanity' and 'competency' . . . vary substan-

---

[13] AM. PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th rev. ed. 2000) (DSM-IV-TR).

tially from their psychiatric counterparts.") *and* Gerard, *supra*, at 393 ("An illness for mental health purposes need not be an illness for legal purposes."). Psychiatry "informs but does not control ultimate legal determinations," *Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002), and the term " 'mental illness' " as used in the DSM-IV "is devoid of any talismanic significance." *Hendricks*, 521 U.S. at 359. Because "mental disease or defect" is a legal, not a medical, term, "what definition of 'mental disease or defect' is to be employed by courts enforcing the criminal law is, in the final analysis, a question of legal, moral and policy—not of medical—judgment." *United States v. Lyons*, 731 F.2d 243, 246 (5th Cir. 1984).

¶68 Inexplicably, the majority suggests that construing the term " 'mental disease or defect' " would "unduly encroach upon the legislative function." Majority at 116-17. On the contrary, it is our responsibility. Courts should consult medical experts and the DSM-IV when determining whether an insanity acquittee suffers from a "mental disease or defect." But they must independently evaluate whether a medical diagnosis of mental illness constitutes a legal "mental disease or defect."

¶69 The majority would allow psychologists to determine "whom to excuse from the consequences of criminal behavior and whom to hospitalize involuntarily" to mental health professionals. Gerard, *supra*, at 393. But the legislature and the legal system should determine the threshold requirements for the civil commitment of insanity acquittees, not medical psychological experts. "If society, through the civil commitment procedure, is to have the power to deprive an innocent person of freedom, it has a resultant compelling interest in limiting the numbers and types of people who will be subject to the process." *Id.* at 395.

D. "Polysubstance Dependence" Is Not a "Mental Disease or Defect"

¶70 An expert's diagnosis of mental illness alone is insufficient to support a legal finding that an insanity

acquittee suffers from a "mental disease or defect." *See State v. Sommerville*, 86 Wn. App. 700, 711, 937 P.2d 1317 (1997). When considering whether a mental illness diagnosed by an expert constitutes a legal "mental disease or defect," courts must look to the substance of the diagnosis, not merely to its form. The DSM-IV defines "polysubstance dependence" as repeated use of three or more drugs over the course of a year. DSM-IV-TR at 293. Essentially, "polysubstance dependence" means "drug addiction." *See* Herbert Fingarette, *Addiction and Criminal Responsibility*, 84 YALE L.J. 413, 421 n.42 (1975) (noting that experts "now avoid the term 'addiction' " in favor of "dependence").

¶71 So the majority holds that Klein is not entitled to release because she is a drug addict. But it is well-settled that drug addiction is not a legal "mental disease or defect." *See State v. Wicks*, 98 Wn.2d 620, 622, 657 P.2d 781 (1983) (holding "chronic addiction to alcohol does not, itself, constitute insanity"). *And see, e.g., United States v. Lyons*, 731 F.2d 243, 245 (5th Cir. 1984); *United States v. Coffman*, 567 F.2d 960, 963 (10th Cir. 1977); *United States v. Moore*, 158 U.S. App. D.C. 375, 486 F.2d 1139, 1181 (1973) (en banc); *United States v. Stevens*, 461 F.2d 317, 321 (7th Cir. 1972); *United States v. Freeman*, 357 F.2d 606, 625 (2d Cir. 1966). *See also In re Stokes*, 546 A.2d 356, 363 (D.C. 1988); *In re Marquardt*, 100 Ill. App. 3d 741, 427 N.E.2d 411, 56 Ill. Dec. 331 (1981); *and Murphy v. State*, 265 Ind. 116, 126, 352 N.E.2d 479 (1976). *See also* Fingarette, *supra*, at 424-25 (noting that "there is no consensus in the medical profession that addiction is a mental disease"). And if Klein doesn't suffer from a "mental disease or defect," she is entitled to release.

E. Klein Is Entitled to Release Because She Does Not Suffer from a "Mental Disease or Defect"

¶72 The legally relevant facts of this case are identical to those of *Reid*. Both Klein and Reid took drugs, experienced a drug-induced psychotic episode, and committed the actus

reus of a crime. Usually, voluntary intoxication cannot support an insanity defense. Gerard, *supra*, at 397. But Klein and Reid both suffered an *unexpected* drug-induced psychotic episode. And both are likely to experience another psychotic episode upon taking drugs again. We found that Reid no longer suffered from a "mental disease or defect" because he was likely to suffer another psychotic episode only if he took drugs. *Reid*, 144 Wn.2d at 626. Similarly, the trial court here denied Klein's petition for release because of the likelihood she would suffer another psychotic episode upon taking drugs. Klein differs from Reid in only one respect: she's a drug addict. So she's more likely to take drugs and more likely to suffer another psychotic episode.

¶73 But that doesn't make Klein's drug addiction a "mental disease or defect." Drug addicts know what they're doing and the difference between right and wrong. They just don't care. *Cf. Foucha*, 504 U.S. at 74-75 (holding that state must release insanity acquittee who suffered "drug induced psychosis" because "antisocial personality" that makes him dangerous is not a mental disease). Tellingly, if Klein takes drugs and suffers another psychotic episode, she cannot assert an insanity defense because she knows that drug use may trigger a psychotic episode. *See* Adam J. Falk, Note, *Sex Offenders, Mental Illness and Criminal Responsibility: The Constitutional Boundaries of Civil Commitment after* Kansas v. Hendricks, 25 AM. J. L. & MED. 117, 143 (1999) (recommending "that civil commitment be limited to individuals . . . who could not be found criminally responsible"). Klein may well be dangerous, but she isn't insane. And insanity acquittees are entitled to release when they regain their sanity, whether or not they're dangerous. *See Reid*, 144 Wn.2d at 627 n.2 (citing *Foucha*, 504 U.S. at 76 n.4). *And see Parrish*, 78 F.3d at 1477 (holding that "unless an acquittee has an identifiable mental condition, he cannot be held by the state merely because he is dangerous").

III. Conclusion

¶74 Klein isn't insane. She's a drug addict. And because drug addiction isn't a "mental disease or defect," she is entitled to full release under RCW 10.77.200.

¶75 Accordingly, I dissent.

Alexander, C.J., and Madsen, J., concur with Sanders, J.