FILED
6/1/2021
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Detention of | ) | No. 81294-7-I |
| | ) | |
| | ) | |
| | ) | |
| J.H., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

VERELLEN, J. — J.H. argues that the trial court did not adequately advise him that a 14-day involuntary commitment would result in his loss of firearm rights in accordance with RCW 71.05.240(2). But the court's oral advisement, combined with inferences from the surrounding circumstances, establish J.H. was adequately advised.

J.H. also contends that he was not given adequate notice that the State was seeking commitment on the ground that he presented a likelihood of harm to the property of others. But because J.H.'s counsel failed to object and argued that the State had not met its burden on this ground during the hearing, he fails to establish prejudice.

J.H. also challenges his 14-day involuntary commitment as lacking substantial evidence. But the testimony of the mental health counselor, the social worker, and J.H.'s mother supports the trial court's finding that J.H. suffers from bipolar disorder. That finding, together with the mother's description of events she observed at her house, supports the court's conclusion that J.H. presented a

likelihood of serious harm to the property of others and that J.H. was gravely disabled.

Finally, there is no constitutional right to a jury trial on a 14-day involuntary commitment petition.

Therefore, we affirm.

## FACTS

On February 27, 2020, the Seattle Police Department responded to a call that J.H. was climbing a tree outside the KOMO-TV news station.  According to the responding officer, J.H. was "exhibiting scattered thought patterns and told the responding police officer to taze him."[1]  The responding officers brought J.H. to Virginia Mason Medical Center's emergency department.

Andrew Trindle, a social worker at Virginia Mason, assessed J.H.  Trindle reported that J.H. was "experiencing symptoms of a mental health disorder, characterized by delusional thoughts."[2]  He concluded that J.H. was "at risk for serious consequences and should be detained involuntarily for psychiatric treatment."[3]

The next day, a designated King County crisis responder filed a petition for initial detention.  The petition alleged that J.H. suffered from a "mental disorder"

---

[1] Clerk's Papers (CP) at 1.

[2] CP at 4.

[3] CP at 4.

and that he had recently become "increasingly paranoid, delusional, erratic, and agitated."[4]

After J.H. was detained for 72 hours of psychiatric treatment, Brian Hayden, a licensed mental health counselor at Fairfax Hospital, filed a petition for 14-day involuntary treatment. Hayden diagnosed J.H. with "bipolar affective disorder, type 1, manic with psychosis."[5]

The petition alleged that J.H. suffered "from a mental disorder characterized by erratic behavior, poor impulse control, decreased sleep, depressed mood, aggressive behavior, disorganized thoughts, paranoia, and poor insight and judgment."[6] As a result, Hayden concluded that J.H. was "showing increased loss of cognitive and volitional functioning, poor insight regarding his symptoms" and that further hospitalization was "essential."[7]

On the involuntary commitment petition, Hayden checked the boxes for two of the three possible grounds for involuntary commitment: that J.H. presented "a likelihood of serious harm to self" and that J.H. was "gravely disabled."[8] Hayden did not check the box that J.H. presented a likelihood of serious harm to the property of others. The petition also stated that J.H. had not accepted voluntary

---

[4] CP at 2.
[5] CP at 18.
[6] CP at 18.
[7] CP at 18-19.
[8] CP at 17.

treatment and that he was advised that involuntary commitment "will result" in his loss of firearm rights.[9]

On March 4, 2020, at the probable cause hearing, the State asserted that it was prepared to proceed under the allegations that J.H. presented a likelihood of serious harm to others, likelihood of serious harm to the property of others, and evidence of a grave disability pursuant to RCW 71.05.020(21)(a) and (b). At the outset of the hearing, the court stated:

> I want to advise you, I'm required to advise you, that if you decline to accept or seek voluntary treatment at this time; and at the end of this hearing, if I conclude that you need to be involuntarily detained for your own benefit, then that could result in your loss of firearm rights. So if you need a moment to confer with counsel before you make a final decision, . . . please take that moment.[10]

After the pause, J.H. thanked the court.

At the hearing, three witnesses testified for the State: Trindle, Hayden, and J.H.'s mother. The trial court concluded that a preponderance of the evidence established J.H. presented "a substantial risk of serious harm to the property of others" and was gravely disabled.[11]

On March 5, 2020, the court entered an order committing J.H. to 14-day involuntary treatment and entered findings of fact and conclusions of law.

J.H. appeals.

---

[9] CP at 18.

[10] Report of Proceedings (RP) (Mar. 4, 2020) at 6.

[11] Id. at 90-92

ANALYSIS

I.  Trial Court's Advisement under RCW 71.05.240(2)

J.H. argues that his constitutional right to bear arms was violated because the trial court failed to notify him both orally and in writing that a 14-day involuntary commitment "would" result in his loss of firearm rights.  "We review constitutional issues de novo."[12]

The involuntary commitment statute, RCW 71.05.240(2), provides:

> If the petition is for mental health treatment, the court at the time of the probable cause hearing and before an order of commitment is entered shall inform the person both orally and in writing that the failure to make a good faith effort to seek voluntary treatment as provided in RCW 71.05.230 will result in the loss of his or her firearm rights if the person is subsequently detained for involuntary treatment under this section.

Here, Hayden, the mental health counselor, submitted the petition for involuntary commitment.  The petition stated that "respondent has been advised that involuntary commitment pursuant to this 14-day petition will result in the loss of firearm rights."[13]  Additionally, before the probable cause hearing began, the court advised J.H., "[I]f you decline to accept or seek voluntary treatment at this time; and at the end of this hearing, if I conclude that you need to be involuntarily detained for your own benefit, then that could result in your loss of firearm rights."[14]  The court also urged J.H. to take a moment to

---

[12] City of Seattle v. Evans, 182 Wn. App. 188, 191, 327 P.3d 1303 (2014).

[13] CP at 18.

[14] RP (Mar. 4, 2020) at 6.

5

confer with his counsel. After a pause in the proceeding, J.H. responded, "Thank you, sir."[15]

J.H. contends that the trial court's oral advisement was "incorrect" because the court used "could" instead of "would" and thus, the trial court failed to inform J.H. that involuntary commitment would render his loss of firearm rights "automatic."[16] J.H. relies on In the Matter of Detention of T.C.,[17] where this court held that in the absence of any notice from the trial court itself, a firearms notice in the petition for a 14-day commitment signed by a mental health professional followed by a check-the-box finding entered by the court in the commitment order, after the hearing was concluded, were inadequate.

But unlike in T.C., the court here provided J.H. with an oral notice. And T.C. suggests that a petition advising a patient that involuntary commitment pursuant to the 14-day petition will result in the loss of firearm rights may be a factor in judging the adequacy of notice.[18] This court noted, "Standing alone, this petition does not satisfy the requirements" of the statute mandating notice by the court.[19] And in response to the argument by the State that "the petition can be used to infer understanding on the part of the person subject to

---

[15] Id.

[16] Appellant's Br. at 11-12.

[17] 11 Wn. App. 2d 51, 62-63, 450 P.3d 1230 (2019).

[18] Id. at 63.

[19] Id.

detention" this court stated, "We decline to make such an inference based solely on the petition."[20]

Here, unlike T.C., the court gave an oral notice that the loss of firearm rights can be avoided by voluntary participation in treatment, the court paused the proceeding, directing J.H. to "confer with counsel [about the firearms notice]," and the court urged, "before you make a final decision, . . . please take that moment."[21] After that pause, J.H. acknowledged the court's advisement by responding, "Thank you sir."[22]

There is a difference between "could" and "would," but the oral notice by the court, considered together with the petition advising that involuntary commitment "will result" in his loss of firearm rights, the pause to confer with counsel, and the oral response thanking the court support an inference that a person receiving and responding to such information understands the loss of firearm rights was mandatory. Considered in this particular context, the trial court's advisement complied with RCW 71.05.240(2).

## II. Notice

J.H. argues that his constitutional right to due process was violated because he did not receive notice before the probable cause hearing that the State also sought his commitment based upon the likelihood of serious harm to the property of others.

---

[20] Id. at 64.

[21] RP (Mar. 4, 2020) at 6.

[22] Id.

"An essential principle of due process is the right to notice."[23] To comply with procedural due process, the State must provide the person with sufficient notice of the facts supporting the petition for commitment.[24] Sufficient notice requires that the petition for a 14-day commitment "include a statement by a doctor who is familiar with the patient's illness and prognosis, and who is able to adequately evaluate the patient's mental status and make a recommendation."[25] The purpose of the notice provision is to "'apprise the affected individual of, and permit adequate preparation for, an impending hearing.'"[26] Because J.H. alleges a constitutional error not previously asserted, he bears the burden of establishing actual prejudice.[27] Actual prejudice requires a "'showing . . . that the asserted error had practical and identifiable consequences in the trial of the case.'"[28]

Here, before the commencement of the probable cause hearing, the State said, "And the petitioner is prepared to proceed under the allegation of likelihood of serious harm to others, likelihood of harm to others' property, grave disabilities

---

[23] Morrison v. State Dep't of Labor & Indus., 168 Wn. App. 269, 273, 277 P.3d 675 (2012).

[24] In re Det. of R.P., 89 Wn. App. 212, 216, 948 P.2d 856 (1997).

[25] Id.

[26] In re Det. of Cross, 99 Wn.2d 373, 382, 662 P.2d 828 (1983) (internal quotation marks omitted) (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 14, 98 S. Ct. 1554, 56 L. Ed. 2d 30 (1978)).

[27] In re Pers. Restraint of Delgado, 160 Wn. App. 898, 906, 251 P.3d 899 (2011).

[28] State v. O'Hara, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (internal quotation marks omitted) (quoting State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

[under RCW 71.05.020(21)(a) and (b)]."[29] J.H.'s counsel did not object to the State's addition of the harm to property allegation. Further, in closing argument, J.H.'s counsel alleged that the State had not met its burden with respect to the likelihood of serious harm to the property of others allegation. Because J.H.'s counsel failed to object and responded to the State's argument on the likelihood of serious harm to the property of others allegation, J.H. fails to establish prejudice. And because the trial court need only find one ground to enter a 14-day involuntary commitment, even if J.H. established prejudice as to this ground, J.H. still would have been committed under the trial court's finding that he was gravely disabled.

## III. Sufficiency of the Evidence

J.H. challenges various findings of fact entered by the trial court supporting its conclusions of law that J.H. presented a likelihood of serious harm to the property of others and that J.H. was gravely disabled.

First, J.H. challenges the trial court's finding that he broke windows and a TV at his parents' house six months before the probable cause hearing.

"'[W]here the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment.'"[30] "'Evidence is substantial if it is sufficient to convince a reasonable

---

[29] RP (Mar. 4, 2020) at 5.

[30] In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015) (alteration in original) (quoting In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P. 2d 138 (1986)).

person of the truth of the finding.'"[31] The trier of fact is solely responsible for making credibility determinations.[32] We review conclusions of law de novo.[33]

Under RCW 71.05.020(34)(a)(iii), a person can be involuntarily committed if, as a result of mental disorder, a person presents a likelihood of serious harm to the property of others.[34] The statute requires a "substantial risk that . . . physical harm will be inflicted by a person upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others."[35] Evidence of substantial risk of physical harm must be "evidenced by a recent overt act."[36] But risk of harm is not required to be imminent.[37]

Here, there was substantial evidence to support the trial court's finding that J.H. broke windows and a TV at his parents' house six months before the probable cause hearing. J.H.'s mother testified that about six months before the hearing, J.H. broke her TV and that their house still had damaged windows that had not been replaced. And the court found her testimony credible.

J.H. questions the adequacy of his mother's testimony because she framed her answers about how recently J.H. had destroyed property as "I would guess

---

[31] State v. Coleman, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018) (quoting State v. Klein, 156 Wn.2d 102, 115, 124 P.3d 644 (2005)).

[32] Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003).

[33] In re Estate of Haviland, 162 Wn. App. 548, 561, 255 P.3d 854 (2011).

[34] In re Det. of Harris, 98 Wn.2d 276, 285, 654 P.2d 109 (1982).

[35] Matter of Det. of D.V., 200 Wn. App. 904, 906-07, 403 P.3d 941 (2017).

[36] Harris, 98 Wn.2d at 285.

[37] Id. at 282-85.

probably in the last, you know, maybe, like, six months ago."[38] And "[m]aybe about six months ago. I can't remember for sure."[39] But her testimony is sufficient to convince a reasonable person of the truth of the finding that J.H. recently destroyed property at his parents' house. And that finding supports the trial court's conclusion of law that J.H. exhibited a likelihood of serious harm to the property of others.

Next, J.H. challenges four findings of fact related to the court's conclusion of law that J.H. was gravely disabled under definition (a). He challenges the trial court's findings that he was not self-aware, he declined to take mental health medication at the hospital, he was barefoot when he climbed the tree, and he showers excessively.

A person is gravely disabled under definition (a) if, as a result of a mental disorder, a person "[i]s in danger of serious physical harm resulting from failure to provide for his or her essential needs of health or safety."[40] This definition "requires the State to show that an individual, as a result of a mental disorder, is in danger of serious physical harm as a result of his or her failure to provide for essential health and safety needs."[41]

---

[38] RP (Mar. 4, 2020) at 23.

[39] Id. at 28.

[40] RCW 71.05.020(21)(a); see also In re Det. of R.H., 178 Wn. App. 941, 946, 316 P.3d 535 (2014).

[41] LaBelle, 107 Wn.2d at 203.

J.H.'s mother testified that J.H. does not take "care of himself" and that "[h]e thinks that people are watching him all the time."[42] She also stated that he appears agitated and has been accused of shoplifting multiple times due to the way he acts. Hayden, the mental health counselor, testified that J.H. suffers from a "lack of insight" and "grandiose hallucinations."[43] He noted that J.H. is "paranoid, tangential, [and] illogical."[44]

Hayden read into the record a report from a nurse observing J.H. who noted that he was noncompliant with psychiatric medication. Hayden also testified that the nurse's report stated that while in the hospital, J.H. refused Risperidone.

J.H.'s mother testified that J.H. showers excessively because "he thinks he smells a lot . . . [a]nd at stores, thinks people are walking away from him because he smells so bad."[45] She also stated that J.H.'s doctor described his showering habits as unhealthy. The trial court found their testimony credible.

The trial court's finding that J.H. was barefoot when he climbed the tree outside the KOMO-TV news station is not supported by substantial evidence.

But substantial evidence supports the trial court's findings that J.H. was not self-aware, that he declined to take mental health medication at the hospital, and that he showers excessively. And those findings, in turn, support the court's conclusion of law that J.H. was gravely disabled under definition (a).

---

[42] RP (Mar. 4, 2020) at 22, 24.

[43] Id. at 56.

[44] Id. at 61.

[45] Id. at 24.

12

J.H. also challenges three findings of fact related to the court's conclusion of law that J.H. was gravely disabled under definition (b).  He challenges the court's findings that he showed severe deterioration in routine functioning, that he has had mental health issues since the age of 10, and that he is still decompensating.

A person is gravely disabled under definition (b) if, as a result of a mental disorder, a person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety."[46]  The court must provide a factual basis to conclude that a person "'manifests severe [mental] deterioration in routine functioning.'"[47]  "'Such evidence must include recent proof or significant loss of cognitive or volitional control.  In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety.'"[48]

Trindle, the social worker, testified that J.H. initially told him that he was committed for trying to draw awareness to a car dealership that was recording phone calls without consent.  But J.H. then told Trindle that he climbed the tree

---

[46] RCW 71.05.020(21)(b); R.H., 178 Wn. App. at 946.

[47] In re Det. of M.K., 168 Wn. App. 621, 627, 279 P.3d 897 (2012) (alteration in original) (quoting LaBelle, 107 Wn.2d at 208).

[48] Id. (quoting LaBelle, 107 Wn.2d at 208).

because he was concerned about a security company that failed to prevent drug and gang activity in an apartment building.

J.H.'s mother testified that J.H.'s mental health issues began when he was in the fifth or sixth grade. She stated that in fifth grade, he began to have significant problems in school and was diagnosed with oppositional defiance disorder.

Hayden testified that most recently he diagnosed J.H. with bipolar disorder with "manic and psychotic features."[49] He read a psychiatric progress note into the record which noted that J.H.'s "[c]oncentration, insight, and judgment" were "all" impaired.[50] Hayden opined that "due to [J.H.'s] lack of insight regarding his symptoms and condition, there is likely continued decompensation."[51] The court found their testimony credible.

Substantial evidence supports the court's findings of fact that J.H. demonstrated severe deterioration in routine functioning, that he has had mental health issues since the age of 10, and that he is still decompensating. And those findings, in turn, support the court's conclusion of law that J.H. was gravely disabled under definition (b).

IV.  Right to Jury Trial

J.H. argues that he was deprived of his constitutional right to have a jury determine if he had a mental illness justifying a 14-day involuntary commitment.

---

[49] RP (Mar. 4, 2020) at 55.

[50] Id. at 64.

[51] Id. at 67.

In <u>In re the Detention of S.E.</u>, we rejected this argument.[52] In <u>S.E.</u>, this court analyzed the history of the right to a jury trial and held that there is no right to a jury trial in a hearing on a 14-day involuntary commitment petition.[53] The holding in <u>S.E.</u> of no right to a jury trial was confirmed in <u>T.C.</u>[54]

J.H. contends <u>S.E.</u> was incorrectly decided. He relies on <u>In re the Matter of Ellern</u> in support of his proposition. But, as this court explained in <u>T.C.</u>, <u>Ellern</u> "differs significantly" from <u>S.E.</u> because it "involved an individual who was detained for nearly five months and facing indefinite involuntary commitment."[55] For the reasons explained in <u>S.E.</u> and <u>T.C.</u>, J.H. was not entitled to a jury trial.

Therefore, we affirm.

WE CONCUR:

---

[52] 199 Wn. App. 609, 400 P.3d 1217 (2017).

[53] <u>Id.</u> at 618.

[54] <u>T.C.</u>, 11 Wn. App. 2d at 59-60.

[55] <u>Id.</u> at 60.