# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59053-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JARED STANDLEY, | |
| Appellant. | |

CHE, J. — Jared Parker Takeo Standley appeals the denial of his partial conditional release request for staff-escorted community outings (SECO) and unescorted grounds privileges (UGP).

A trial court found Standley not guilty by reason of insanity on two counts of aggravated murder and committed him to a state hospital. In 2023, Standley sought conditional release. At the conditional release hearing, the trial court, among other evidence, admitted eight exhibits under the business records exception to hearsay. The trial court denied Standley's petition, concluding that substantial evidence supported the denial.

Standley argues that (1) prejudicial error occurred by the trial court improperly admitting eight exhibits under the business records exception to hearsay, (2) prejudicial error occurred by the trial court allowing one of Standley's treatment professionals to provide opinion testimony,

(3) insufficient evidence supported various findings of fact, and (4) the findings of fact did not support the trial court's conclusions of law or its decision denying Standley's petition.

We hold (1) the trial court did not err in admitting the eight exhibits and, even if it did err in relation to Exhibits 1 and 4, Standley was not prejudiced by the trial court's rulings, (2) the treatment professional's testimony was admissible, (3) substantial evidence supports each of the challenged findings of fact, and (4) the findings of fact support the trial court's conclusions to deny Standley's petition for partial conditional release.

Accordingly, we affirm the trial court's denial of Standley's petition for partial conditional release.

FACTS

BACKGROUND

Standley murdered both his parents in 2018. Standley killed his parents, believing that they were part of a gang that was coming after him. Standley first beat his mother to death with a baseball bat in their home. When Standley's father came home, Standley shot him in the head through the glass of their front door.

The trial court found Standley not guilty by reason of insanity (NGRI) on two counts of aggravated first degree murder, finding that he committed the murders while under active symptoms of schizophrenia and that the symptoms caused him to not be able to distinguish right from wrong. In 2019, the court committed Standley to Western State Hospital (WSH) for a maximum commitment date of life based upon the index offenses of two counts of aggravated first degree murder.

*Standley's Diagnoses and Treatment*

When Standley murdered his parents, it was his first known act of violence. Prior to his index offenses, Standley neither received regular mental health treatment nor medication. Within months of the index offenses, Standley's symptoms developed from "prodromal symptoms" to acute psychosis.[1] Ex. 11 at 2. Standley was diagnosed with schizophrenia, substance use disorder, and an unspecified anxiety disorder and, upon admission to WSH, was prescribed antipsychotic medication.

Standley was diagnosed specifically with paranoid schizophrenia, which meant that one of his predominant symptoms was "paranoia or a fear that something terrible might happen to [him], that [his] life or maybe the life of someone [he] love[s] is in danger." 2 Rep. of Proc. (2 RP) (Nov. 13, 2023) at 198. According to Dr. Ramsha Rao, Standley's psychiatrist, between September 2022 and March 2023 Standley's paranoid schizophrenia overlapped with anxiety because paranoia schizophrenia creates a "profound sense of anxiety" as a symptom. 2 RP at 198. Dr. Rao described this overlap as relating to one's fight or flight response. 2 RP at 198.

Standley's paranoid schizophrenia presented primarily with delusions, which are thoughts or beliefs "not based in reality and [that] cannot be changed despite being given evidence to the contrary that is based in fact." 2 RP at 196. Patients experiencing delusions are more dangerous than patients experiencing other symptoms of schizophrenia, such as disorganized thinking, because delusions are "unflinchingly rigid . . . they cannot be changed."[2] 2 RP at 196.

---

[1] "Prodromal" symptoms are symptoms which provide warning or notice of a disease. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1790, 1810 (2002).

[2] Disorganized thought is a nonlinear thought process.

Delusions are also dangerous because delusional patients do not always show outward symptoms: "you would not know [] delusions exist until they start acting on the basis of their delusions or you're able to have a conversation with them that elicits those delusions." 2 RP at 197.

According to Dr. Brian Young, a Washington State Department of Social and Health Services (DSHS) forensic evaluator based at WSH and who specialized in risk assessment, Standley's "persecutory delusional beliefs, believing that people were trying to harm him when it was not really the case," were one of Standley's "most troublesome symptom" and were the type of symptoms Standley experienced during his index offense.[3, 4] 1 RP (Nov. 8, 2023) (1 RP) at 17.

Upon admission to WSH, Standley's treatment team prescribed him medications to manage his schizophrenia symptoms. Dr. Rao's treatment plan for Standley also included group therapy sessions and weekly one-on-one therapy sessions with Christina Baity, Standley's primary therapist, as well as others. Dr. Rao explained that schizophrenia was not an illness that could be cured and was a progressive illness, meaning that there was a likelihood that Standley's illness could worsen over time. Due to schizophrenia's qualities, "one of the big components of managing schizophrenia is recognizing . . . how the illness functions and being very vigilant to

---

[3] Dr. Michael Stanfill, a licensed psychologist and board-certified forensic psychologist, hired by Standley, described persecutory and paranoid delusions as "thinking things and that people are coming after [a person] that . . . [don't] have any real basis in reality." 1 RP at 137, 139.

[4] Dr. Young also testified that Standley's diagnosis symptoms included auditory hallucinations and social skills challenges. Hallucinations occur when someone senses things that might not be based in reality. Dr. Young also stated that Standley tended to distrust people after a half an hour or more of talking to them.

any symptoms that can be present and addressing them immediately as they present." 2 RP at 200.

Both Drs. Rao and Young had to rely on Standley to report his symptoms. Dr. Rao believed that, if Standley failed to report symptoms, his level of dangerousness would "increase[] exponentially . . . because not reporting those symptoms can also speak to a lingering paranoia and potentially worsening paranoia, and that prevents . . . the treatment team from intervening early and appropriately." 2 RP at 200.

In the NGRI system, part of the treatment team's responsibilities included being advocates for their patients, which includes advocating for their patients "earning their right to move forward and progress to [privilege] level[s]" during the partial conditional release process. 1 RP at 117. Because of their role with patients, it was inevitable that treatment professionals would share opinions not necessarily relevant in risk assessment during the conditional release process.

*Standley's Prior Requests for Privilege Increases*

In March of 2020 and March of 2021, Standley experienced psychotic symptoms but was stabilized shortly after each episode with medication. In August 2021, Standley requested SECO privileges for the first time.[5] SECO privileges would have allowed Standley to go out into the public unrestrained and with unarmed staff members and potentially other like-privileged peers. If Standley were to act out during SECO, staff's options would be either taking Standley back to

---

[5] SECO privileges were previously referred to by WSH as "Level 4" privileges. 1 RP at 95. As a "Level 3," Standley was allowed to have escorted walks around the hospital's boundary and unescorted walks around the hospital's quad, a secured area. 1 RP at 95.

the hospital or calling the local authorities and waiting for their assistance. Neither Standley's treatment team, the WSH's Forensic Risk Review Board (RRB)[6] nor DSHS's public safety review panel (PSRP) supported Standley's 2021 request. For the 2021 petition, the RRB and the PSRP noted that part of their reasoning for not supporting Standley's request included Standley's re-emergence of symptoms that year and his inconsistent insight in identifying warning signs.[7, 8]

In February 2022, Standley had "breakthrough symptoms" of "persecutory ideation" while walking on the hospital grounds with staff, despite being compliant with his medication treatment. 1 RP at 69, 118. Standley thought he saw someone he knew from outside of the hospital community and someone who was a danger to him. Standley mentioned what he saw to staff and inquired if he could ask the person he thought he recognized to take off her mask or otherwise let him see who she was. Dr. Young explained that these breakthrough symptoms mirrored those that Standley experienced during his index offense and that Standley experienced the breakthrough symptom despite taking his treatment medication.

---

[6] The RRB is a panel of individuals with different specializations, including psychologists, social workers, nurses, and rehab professionals.

[7] A copy of the nonsupport letter from the DSHS secretary's designee, summarizing its recommendation as well as the opinion of the two bodies, was sent to Standley.

[8] "Insight" relates to awareness and, in the context of psychological risk assessment, means "understanding and awareness of one's mental illness and substance use issues and violence risk factors." 1 RP at 62. Dr. Young explained that "good insight correlated with lower violence risk, and poor insight correlates with higher violence risk. . . . also, if someone has poor awareness of their mental illness or substance use issues or violence risk factors, they're less likely to do anything to make those better." 1 RP at 62.

In August 2022, Dr. Young completed a risk assessment of Standley and discussed the February "breakthrough symptom" incident in his report.[9] 1 RP at 46. In September 2022, when Standley requested increased privileges, including SECO, with his treatment team's support, neither the RRB, the PSRP, nor the DSHS secretary's designee supported his request. The RRB mentioned the February incident as well as Standley's continued limited insight into his mental illness and the risks of violence as reasons for its nonsupport. According to Dr. Young, because Standley received copies of the reports and had above average intelligence, Standley would have been aware that the February 2022 incident was "a key feature" for why he was denied SECO.[10] 1 RP at 47.

In 2023, Standley attended group therapy sessions with Sean Johnson.[11] Johnson had a master's degree in psychology, was a licensed drug and alcohol counselor and mental health counselor associate, and had a substance use disorder professional certification through the state. Prior to 2023, Johnson worked at WSH for approximately eight years, including five years specifically in the NGRI side of the hospital. In group treatment sessions, Johnson interacted daily with 30 to 45 patients within the NGRI wards with the majority of the patients having some

---

[9] In Dr. Young's report, he described this incident as Standley experiencing "breakthrough persecutory ideation." Ex. 4 at PDF 3. Dr. Young testified that persecutory delusional beliefs are "believing that people [are] trying to harm [you] when it [is] not really the case." 1 RP at 17. Similarly, Dr. Stanfill stated that persecutory and paranoid delusions consist of "thinking things and [] people are coming after [a person] that aren't really - - doesn't have any real basis in reality." 1 RP at 139.

[10] Like with the 2021 letter, a copy of the nonsupport letter from the DSHS secretary's designee, summarizing its recommendation as well as the opinion of the RRB, went to Standley.

[11] Primarily, group therapy sessions focused on "evidence-based practice curriculum" based on "cognitive behavioral therapy, . . . looking at how somebody's thought processes impact their emotional state and then consequently their behaviors as well." 2 RP at 236-37.

psychotic disorder. His daily work included assessing individuals within the groups, observing any symptoms they may be exhibiting, and documenting those symptoms. Standley participated in multiple group therapy sessions with Johnson.

Johnson noted that Standley's attendance in group therapy sessions "started out good" with Standley attending at least 70 percent of sessions. 2 RP at 237. But after the last denial of his privilege increase request, Standley's attendance "dropped off significantly" to around less than 10 percent. 2 RP at 237. When Standley did attend the group therapy sessions, he avoided discussing his index offenses when prompted and appeared guarded in discussing symptoms. When discussing the February 2022 incident, Standley described it as an overreaction by the treatment team and that he was not being paranoid but just cautious during the incident.

Following Standley's marked absence from group therapy sessions, Standley told Johnson at a group therapy session that he had not been attending because he believed "we had nothing left to offer him [and] he was Level 4 material." 2 RP at 242. According to Johnson, Standley's statements "show[ed] a serious lack of insight as the therapeutic process doesn't simply end once somebody attends some groups. This is an ongoing serious mental illness that requires serious therapy that doesn't just have a termination date." 2 RP at 243. Johnson testified that Standley's lack of insight presented a moderate to high risk that Standley would pose to other people or to safety in the community if he had SECO or UGP privileges. UGP privileges would allow Standley to go out on to the hospital's "fairly large" grounds unescorted, without staff.[12] 1 RP at 96.

---

[12] With UGP, a person could walk off campus without much difficulty if they wanted to do so. Like with SECO, safety procedures available during UGP simply meant that a staff person would be present with a cell phone to call 911 if anything happened.

*Therapy Sessions with Hanniball, Dr. Rao, and South*

In February and March 2023, Katherine Hanniball, a psychology doctoral candidate intern, provided individual therapy sessions to Standley. Dr. Rao had regular daily contact with Standley. Both Hanniball and Dr. Rao observed that when discussing any unpleasant or challenging topics with Standley, he presented as "very angry and ha[d] difficulty regulating his anger." 2 RP at 188. Dr. Rao and the treatment team were concerned that Standley's presentation "was coming from a place of overcontrol" which could be a concern "because control only goes so far." 2 RP at 188. Overcontrol is related to a lack of insight as "having the sense of profound confidence that the illness is in fact controlled and also that your emotions are well controlled when in fact they aren't." 2 RP at 189.

Standley's presentation made both Hanniball and Dr. Rao fearful for their personal safety, and they both adopted precautions because of how unsafe they felt during Standley's treatment sessions. According to Dr. Rao, a standard part of treatment included "challenging" her patients in order to alter their insight. 2 RP at 203. However, she began avoiding "any topic or any conversation that [Standley] might find challenging" and trying to make their interactions "as comfortable as possible," in part, because she felt unsafe. 2 RP at 203-204. Dr. Rao "did not feel [challenging Standley] would be beneficial for [her] long-term working relationship with [] Standley, and [she] did not want to be in a situation where [she] was unsafe . . . [She] did not feel comfortable challenging him." 2 RP at 203-204. Dr. Rao had been a medical professional for at least eight years before this interaction. As a result of Standley's behavior, Dr. Rao described Standley's treatment with her as "stopped or plateaued." 2 RP at 203.

According to Dr. Rao, Hanniball "had to take a lot of precautions and go in a virtual setting" so Hanniball could comfortably still challenge Standley. 2 RP at 204. Dr. Young explained that, as described in Hanniball's treatment note describing an in-person session, Standley's "anger was [] pretty intense" and Hanniball felt uncomfortable enough to move their sessions to a virtual format. 1 RP at 36. Hanniball's notes reflected that Hanniball confronted Standley about the interaction and told Standley that she "felt threatened by the intensity of [Standley's] anger." 1 RP at 36.

Dr. Young also stated that Stacy South, a psychology associate providing treatment to Standley in March 2023, noted in her reports that Standley appeared to engage in defensiveness by making jokes or sarcastic comments and exhibited possibly early warning signs of paranoia.

*Standley's Current Request for SECO Privileges*

Between June and August 2023, Standley requested SECO privileges again, and his treatment team supported his requests. Baity believed Standley was ready for SECO privileges but was unaware of Standley exhibiting symptoms. While Standley developed coping mechanisms to deal with his symptoms on an ongoing basis and Baity observed him using those skills, she had not observed Standley experience symptoms since she began working with him in May 2022.

In early August, Dr. Young completed a forensic risk assessment update on Standley. According to Dr. Young and Dr. Michael Stanfill, Standley's retained psychologist, Standley's risk to the public if he were to receive SECO or UGP privileges would be low. Dr. Stanfill initially evaluated Standley in October 2022 and submitted a report in March 2023. Dr. Stanfill thought Standley presented with an "absence of paranoia" since March 2022, despite

acknowledging Hanniball's experience of Standley's "increased agitation and anger" in February and March of 2023. 1 RP at 140. Dr. Young believed that Standley lacked insight in the sense of underestimating the severity of his mental health and substance use issue. Moreover, Dr. Young agreed there was a risk that Standley would not report symptoms if Standley wanted to earn increased privileges.

Around September 2023, Dr. Rao, described Standley's insight into understanding schizophrenia as "gradually improving" although not "fair," and his insight into his schizophrenia symptoms as "fair, not good." 2 RP at 209-10. Considering Standley's insight and risk for violence, Dr. Rao believed that he needed "gradual conservative incremental increases in privileges where he [could] be monitored, he [could] have support, and . . . in a safe manner." 2 RP at 212. Compared to Dr. Rao's other patients, she acknowledged that Standley posed a very high level of danger due to his index offenses. She also admitted that merely having a staff member available during SECOs with a cell phone would not be a sufficient safety measure given Standley's offenses. Despite that admission, she explained that Standley's treatment team could minimize future safety concerns by withholding SECO privileges if he presented with symptoms or the team had "grave concerns." 2 RP at 213.

The RRB reviewed Standley's request and voted to support Standley acquiring SECO privilege. Following the RRB's support, Standley's request was sent to the PSRP.

*Johnson's September Observations*

On September 1, 2023, Standley attended a group treatment session on illness management recovery, when Johnson observed Standley displaying concerning symptoms which motivated Johnson to chart paranoia. When the group was discussing persistent symptoms,

Standley began discussing his index crimes and said, "I don't know if there was still - - I'm still not sure if there was some abuse or trauma that occurred as a result of a family member or my parents." 2 RP at 241. This alarmed Johnson because "the nature of the delusions [Standley] was referencing prior were - -  were directly related to beliefs about his parents, which led to the index crime." 2 RP at 241. When Johnson asked Standley what he was experiencing, Standley responded, "anxiety," an "[o]verall general anxious feeling." 2 RP at 245. Connecting Standley's response to his just prior discussion of the circumstances surrounding the index crimes, Johnson described Standley as presenting with a more specific symptom of paranoia.

Johnson noted his belief that Standley was experiencing psychotic symptoms in progress notes. Baity saw Johnson's September progress note and agreed that, if Standley were in fact experiencing psychotic symptoms at that time, it would have been important information for the RRB and the DSHS's secretary designee to hear when considering Standley's request. However, Baity did not include reference to Johnson's chart note in her letter to those groups and, regardless, Johnson's note did not change her opinion on whether Standley should receive SECO privileges. Dr. Stanfill found Standley ready for SECO and UGP. Subsequently, Johnson's September 2023 chart note did not change Dr. Stanfill's opinion. Additionally, Dr. Rao, while she was unaware of Johnson's note, did not find Johnson's note concerning due to the overlap between schizophrenia and anxiety and the difficulty in distinguishing between the two.

In late September, the PSRP reviewed Standley's application and supported his request for SECO privileges.

In October, Standley petitioned the trial court for partial conditional release from WSH so to gain SECO and UGP privileges. Attached to Standley's petition was the forensic

psychological evaluation completed by Dr. Stanfill; a letter that Baity adopted as her own communicating the treatment team, RRB, PSRP, and the DSHS secretary's designee's support; a letter addressed to the DSHS from the PSRP regarding their recommendation; and Dr. Young's August 2023 forensic risk assessment update.

At trial, the witnesses testified consistently with the facts above. Additional facts are included below when applicable in the analysis below.

PROCEDURAL HISTORY

*Admitted Exhibits*

During Baity's testimony, Standley offered proposed Exhibit 11 as a business record and the trial court admitted it into evidence. Exhibit 11 contained a copy of a letter to the trial court dated October 10, 2023, which provided an updated report on Standley's 2023 request for SECO and a progress report. The letter included excerpts from Dr. Young's August 2023 forensic risk assessment, including statements that Standley's "baseline risk [was] elevated by several present historical factors," his "static risk factors suggest[ed] a moderate long-term risk for violent recidivism," and Standley "ha[d] continued to make significant progress in treatment during the past year." Ex. 11 at PDF 7.

Prior to the trial court admitting Exhibit 11, Baity testified that she recognized the October 10 letter as "a dated court letter for SECOs," had previously reviewed and signed the letter, and stated that it was a part of Standley's chart. RP (Nov 8, 2023) at 99. Baity stated that, while the NGRI specialist wrote the letter, the letter contained her work and she adopted it as her own letter.

13

The State offered into evidence proposed Exhibits 1, 2, 3, 4, 6, 7, 8, and 9 as business records over Standley's objections.

Exhibit 1 contained a copy of two six-month progress report letters submitted to the trial court as required by RCW 10.77.140: one dated April 7, 2023, and signed by both Baity and Dr. Rao; and the other dated October 14, 2022, and signed by Baity and others.[13] The April 2023 progress report stated that "[] Standley ha[d] made marginal gains in mitigating his risk for future violent and/or aggressive behavior against others." Ex. 1 at PDF 2 (emphasis omitted). The progress report also included conclusions from a forensic risk assessment completed in August 2022 by Dr. Young that Standley's "baseline risk [was] elevated by several present historical factors," that his "static risk factors suggest[ed] a moderate long-term risk for violent recidivism," and that Standley "ha[d] continued to make significant progress in treatment during the past year." Ex. 1 at PDF 3. The October 2022 progress report stated that Standley "ha[d] made substantial[] gains in mitigating his risk," and also contained the same excerpt from Dr. Young's August 2022 assessment. Ex. 1 at PDF 7.

Exhibit 2 included multiple progress reports from late February to late August 2023 with most reports authored by Baity. Exhibit 3 contained two "Feedback Form[s]" from the RRB, communicating their nonsupport for Standley's prior petitions for privilege increases, one from October 2021 and the other from October 2022. Ex. 3 at PDF 2-3.

Exhibit 4 contained a January 2023 letter of nonsupport from DSHS's secretary designee signed by three people including Baity and Dr. Rao as well as a December 2021 letter of nonsupport signed by other individuals. The January 2023 letter included a statement that "[i]t

---

[13] RCW 10.77.140 requires WSH to submit progress reports to the superior court.

[was] the RRB's recommendation that [] Standley may not be conditionally released, without substantial danger to other persons." Ex. 4 at PDF 3. It also stated that the DSHS's secretary designee "believe[d] that [] Standley poses a significant public safety risk and is in need of further oversight from [WSH]." Ex. 4 at PDF 4.

Exhibit 6 was a psychiatric progress note from Dr. Rao dated March 8, 2023. Exhibit 7 included progress reports from Johnson spanning from late January to early September 2023, among other progress notes. Exhibit 8 included progress reports from between December 2022 and March 2023, authored by South, Hanniball, or another. Exhibit 9 contained progress reports from between early February and late March 2023 and authored by various individuals, including Dr. Young and Hanniball.

Before the State offered Exhibits 1, 2, 3, 4, 6, 7, 8, and 9, Dr. Young and Baity testified. Dr Young testified that his job as a forensic risk evaluator based at WSH required him to review Standley's treatment records, "other relevant" patient records, and discovery files, and also consult with Baity and Standley's other treatment team members. 1 RP at 13. For Dr. Young's August 2023 forensic risk assessment of Standley, he reviewed Standley's treatment records from the past year and "letters to the Court in his case." 1 RP at 14. As a follow-up to his report, Dr. Young testified to reviewing Standley's electronic records before trial.

Throughout his testimony, Dr. Young mentioned Standley's records generally as well as several of the exhibits specifically. Dr. Young described chart notes describing Standley's presentation during vocational work as well as in treatment groups. Dr. Young also summarized that, from reviewing Standley's record, Standley appeared to be employing coping skills and he exhibited good self-control when in situations with other patients, but Standley's attendance for

his assigned group therapy sessions was "variable or partial." 1 RP at 32. He had reviewed Hanniball's February/March 2023 interactions with Standley and knew that both psychiatrists and therapists were uncomfortable with Standley's expressions of anger during therapy sessions.

When Dr. Young was presented with Exhibit 9, he testified that they were progress notes, including a note from Hanniball on February 8, 2023. The court then admitted Exhibit 9 as information that Dr. Young relied on in forming his opinions on Standley.[14] When the State presented Dr. Young with Exhibit 6, Dr. Young identified the record as a report of Dr. Rao's treatment of Standley completed in March 2023.[15] He later identified Exhibit 7 as progress notes contained within Standley's electronic record which Dr. Young reviewed. He also identified Exhibit 8 as containing reports from South dating back to March 2023.

Baity later testified that, as Standley's primary therapist, her responsibilities included, amongst others, communicating with the treatment team, documentation, completing treatment plan updates, preparing NGRI updates, and communicating with other members of "the team to see how they're doing." 1 RP at 102. As Standley's primary therapist, Baity had access to Standley's entire chart, including an electronic chart.[16] While Baity stated that she utilized some but not others of the proffered exhibit documents in the course of her daily work, Baity

---

[14] Standley objected on the basis of foundation, arguing that there was no testimony regarding the production of the record and that the notes contained levels of hearsay.

[15] The State offered Exhibit 6 into evidence at this time "[a]s a basis of [Dr. Young's] opinion" and as impeachable material; however, the trial court declined to admit the exhibit at this time. 1 RP at 59.

[16] Standley's chart included both physical and electronic files. While Baity testified that she has access to the entire record, she stated that she never used the physical chart.

recognized all the documents as a part of the WSH's electronic chart kept in the regular course of its business.[17]  Baity did not read through each treatment team document in the files, but recognized the records were part of Standley's electronic chart kept in WSH's regular course of business because she had access to his electronic chart.  Baity identified these documents as a report made by Dr. Rao and progress records from other people on Standley's treatment team as documents she had not utilized.

When the State offered proposed Exhibits 1, 2, 4, 6, 7, 8, and 9 as business records, Standley's counsel objected on two grounds: first, because "Baity hasn't reviewed and hasn't used [those records] in her practice," and, second, because the records "very likely include layers of inadmissible hearsay."  1 RP at 106-07.  The trial court found the business record foundation met and admitted the exhibits as business records.

The State later offered proposed Exhibit 3 after Baity identified the exhibit as two letters of nonsupport from the RRB following Standley's 2021 and 2022 petitions, and testified that the documents were part of the treatment team's chart for Standley at WSH and they were kept in the regular course of the WSH's business.  The trial court admitted the exhibit over Standley's objection for the same two bases as the prior exhibits.

After the court admitted the exhibits above, Johnson described progress notes as "fundamental" to ensuring the treatment team and others at WSH were aware of the patient's presentation during therapy sessions.  2 RP at 239.  Johnson testified that notes charted in the electronic system were accessible to "everybody" and he relied on them at times by assuming

---

[17] Baity utilized Exhibits 1, 2, and 4, but not 6, 7, 8, and 9 in the course of her daily work.

that treatment team members would read them. Charting progress notes was a required part of Johnson's job.

Johnson also testified that Standley's lack of insight presented a moderate to high risk to other people or to safety in the community that Standley would have with SECO or UGP privileges. Standley objected to Johnson's testimony, arguing that Johnson lacked expertise to opine about risk. The court overruled the objection and permitted the testimony.

*The Trial Court's Findings of Fact and Conclusions of Law*

The trial court entered written findings of fact (FF) and conclusions of law (CL), ultimately denying Standley's request for conditional release through either SECO or UGP privileges. In making its decision, the court found by a preponderance of evidence various findings of fact supporting its determination.

Under a heading titled, "Findings of Fact as to Credibility," the trial court made the following findings:

> 1.      The Court finds the relevant and material facts as described below. Where testimony or other evidence differed from the Court's findings, the Court specifically finds that [the] testimony or evidence lacks credibility.
>
> 2.      Dr. [] Young admitted being aware that [Standley] posed a substantial danger to [] Hannibal[l] in March 2023 such that in consultation with Dr. Ra[o], [] Hannibal[l] discontinued meeting [Standley] face to face and conducted the remainder of her individual therapy with [Standley] via telehealth. He also acknowledged that [Standley] lacks insight and has a strong and specific motive to not report symptoms because he has been denied privilege increases in the past when he reported breakthrough symptoms. These and other acknowledgments during Dr. Young's testimony undermined the credibility of his opinion concerning whether [Standley] poses a substantial danger to other persons, or a substantial danger of committing criminal acts jeopardizing public safety or security. In this regard Dr. Young's testimony lacked credibility.
>
> 3.      [] Baity's testimony was not persuasive and lacked credibility. Throughout her testimony, [] Baity's demeanor and the content of her testimony lacked

credibility because of obvious bias. . . . In a number of areas, including where she acknowledged not being aware of [] Johnson's progress notes, [] Baity's testimony was alarming and astounding because of her obvious bias.

4. Dr. Stanfill'[s] testimony was not persuasive and lacked credibility. His objectivity and independence were lacking because he had financial reasons for not modifying his opinion in the face of new and contradictory information. . . . [W]hen made aware of a substantial body of contradictory evidence from the progress notes during 2023, he was dismissive of that evidence even though it called into question his opinion concerning dangerousness.

5. Dr. Ra[o]'s testimony concerning [Standley's] behavior and symptoms was credible. She described [Standley] as having displayed anger, delusional thinking, and rigid thought processes in response to treatment related to his index offense. She also observed lack of insight and increasing symptoms during 2023 which rendered his progress "fair" but "not good." Concerning paranoid schizophrenia, lack of insight is especially dangerous because it is what enables [Standley] to regulate his disease. She sanctioned the treatment team's stoppage of treatment related to [Standley's] insight into his index offense and symptoms of schizophrenia out of a concern for her own safety and the safety of other members of the treatment team. Dr. Rao's opinion concerning dangerousness was not credible both because she was a part of [Standley's] treatment team and had bias similar to that of [] Baity, and because she minimized the importance of reported symptoms in progress notes submitted by [Standley's] other treatment providers.

6. Johnson's testimony concerning breakthrough symptoms during 2023 was credible. It was corroborated by references in the progress notes to [Standley] having displayed symptoms when challenged concerning his index offense. His description of [Standley] presenting as guarded supported his observation that [Standley] was experiencing persistent symptoms of paranoia and lack of insight directly related to the violence which he perpetrated during his index offense. Furthermore his credibility was enhanced by five years of work with paranoid schizophrenia patients and face to face contact with them on a daily basis.

CP at 122-24.

Under a heading titled, "Findings of Fact," the trial court made the following additional findings:

9. [Standley's 2021 petition] was not supported by the Secretary's Designee, nor by the RRB, nor by the [PSRP]. . . . The reasons for the non-support were provided in writing to [Standley] and included reference to increased symptoms

and the appropriate responses [Standley] and his treatment team would need to make to address them.

10.     [Standley's 2022 petition] also was not supported by the Secretary's Designee, nor by the RRB nor the PSRP. . . . The reasons for non-support were provided in writing to [Standley] and included reference to his experience of breakthrough symptoms.

. . . .

12.     . . . The treatment team concluded that [the 2022 breakthrough] incident was a serious setback and a primary reason for the rejection of [Standley's] 2022 petition.  [Standley] was advised of the rejection and the reasons for it in writing.

13.     Persecutory ideation consists of fear and anxiety related to delusional beliefs. . . . [Standley] experienced persecutory ideation during the 2022 breakthrough symptom incident.

14.     . . . [Standley's] lack of reporting symptoms coincides with [Standley] having developed a strong motive to conceal symptoms because breakthrough symptoms were a reason for the denial of his 2022 petition. [Standley's] concealment of symptoms caused him to be increasingly guarded and to experience anger and the potential for violence during 2023 because he lacks insight into his index offense and the symptoms of paranoid schizophrenia.

15.     Despite [Standley] not having reported any breakthrough symptoms, his treatment providers have reported that he continues to experience breakthrough symptoms. The reports include reports authored by [] Baity, who repeatedly included in reports that [Standley] continue[d] to use coping skills in response to symptoms. Although [] Baity also reports that [Standley] has been symptom-free during 2023, her references to [Standley] using coping skills contradicts that he is symptom-free and indicates that he continues to be symptomatic.

16.     Indirect indications that [Standley] continues to experience breakthrough symptoms have been accompanied by direct observations. . . . [Symptoms Standley displayed] include[ed] anger and threatening behavior toward the members of his treatment team who sought to address [Standley's] emotional adjustment to his index offense. The reports of symptoms are documents in progress notes authored by Dr. Rao, [] Hannibal[l], [] South, and [] Johnson. All four of these treating professionals reported either angry, threatening behavior that made them concerned for their own physical safety, or that indicated [Standley] was concealing and re-labeling symptoms of persecutory ideation or paranoia. [Standley's] treatment team adopted safety precautions to protect WSH staff from physical danger posed by [Standley] as a result of symptoms during 2023.

17.     Breakthrough symptoms during 2023 have been accompanied by [Standley] avoiding part of his recommended treatment regimen. . . . [Standley's] avoidance of group therapy coincides with group therapists having documented their concern that [Standley] was experiencing breakthrough symptoms.

18.     . . . The repeated references to [Standley] reporting anxiety, which was regarded as paranoia, indicates that [Standley's] insight and sincerity concerning his treatment is lacking. [Standley] has been minimizing and concealing the seriousness and severity of symptoms which are the same symptoms that accompanied his index offence.

19.     The SECO privilege sought by [Standley] consists of [Standley] being permitted to go abroad in public in Lakewood. The precautions attending SECO call for [Standley] to be in the company of unarmed staff persons without restraints. A staff response to a dangerous episode involving [Standley] would consist of the staff person calling for a police response via the 911 dispatch system.

20.     [UGP] consists of [Standley] being permitted to go abroad by himself in the public areas of the WSH campus which are not fenced, guarded, or otherwise secured. Emergency response to a dangerous episode or elopement would necessarily include waiting until the approved UGP time period lapsed, followed by checking the campus area, and only then calling 911 to report the incident.

21.     The level of care and control proposed for the requested SECO and UGP privileges is insufficient. The reoccurrence of breakthrough symptoms during 2023, and the lack of insight and sincerity on the part of [Standley] in reporting and responding to those symptoms poses a grave danger to other persons and a grave danger that [Standley] will commit criminal acts jeopardizing public safety or security if he is permitted to exercise the requested privileges.

CP at 125-29.

Based on these findings, among others, the trial court concluded that substantial evidence supported denying Standley's request for both SECO and UGP privileges. The trial court concluded that Standley could not be conditionally released for the requested privileges because:

[Standley] continued to experience breakthrough symptoms, has not been candid with reporting or addressing the symptoms, lacks insight concerning the symptoms, and thus poses a substantial danger to other persons and a substantial likelihood of committing criminal acts of violence which would jeopardize public safety or security during the exercise of the increased privileges.

21

CP at 129. The trial court additionally concluded that "the support by both [the secretary's designee and the RRB] was questionable because [] Baity and the treatment team were biased and provided biased public safety opinions and recommendations. Therefor[e] the evidence introduced during the hearing more than satisfies [the] statutory evidentiary standard." CP at 129.

Standley appeals.

## ANALYSIS

### I. ADMISSION OF EVIDENCE

Standley argues that the trial court erred in admitting eight exhibits and allowing Johnson to provide his opinion of Stanley's risk to others. Standley contends that the erroneous admission of this evidence prejudiced his case.

A.       *Standard of Review*

Generally, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Otton*, 185 Wn.2d 673, 677, 374 P.3d 1108 (2016). An abuse of discretion occurs when the trial court either adopts a view that no reasonable person would take, bases its decision on facts unsupported in the record, or applies an incorrect legal standard in making its determination. *State v. Sisouvanh*, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

If a trial court abuses its discretion, we then review the error for prejudice to determine whether it was reasonably probable, absent the error, that the outcome of the trial would have been materially affected. *State v. Barry*, 183 Wn.2d 297, 303, 352 P.3d 161 (2015).

B.       *Standley Fails to Show that the Trial Court Erred in Admitting the Exhibits as Business Records or That He Was Prejudiced By an Error*

Standley argues that the trial court erred in admitting Exhibits 1, 2, 3, 4, 6, 7, 8, and 9 as evidence falling within the business records exception. Standley contends that the State failed to lay the required foundation for these exhibits. Standley further argues that many of the exhibits included an additional level of hearsay and that the State failed to justify those layers of hearsay.[18]

An out-of-court statement offered into evidence to prove the truth of the matter asserted, otherwise known as "hearsay," is inadmissible unless an exception applies. ER 801(c); ER 802. An exception exists for business records under RCW 5.45.020. *State v. Iverson*, 126 Wn. App. 329, 337, 108 P.3d 799 (2005); *see also* ER 803(a)(6). To be admissible under the business records exception, a record must (1) be in record form, (2) be of an act, condition or event as opposed to an opinion of the recorder or statement of cause, (3) be made in the regular course of business, (4) be made relatively contemporaneous to the time of the act, condition or event, and (5) the court must be satisfied that "'the sources of information, method and time of preparation were such as to justify its admission.'" *In re Welfare of M.R.*, 200 Wn.2d 363, 377, 518 P.3d 214 (2022) (quoting *State v. Kreck*, 86 Wn.2d 112, 118, 542 P.2d 782 (1975)); *see* RCW 5.45.020.

---

[18] Standley also asserts that the contents of the records contained unpermitted conclusions or opinions. However, so to provide the trial court with an "opportunity to prevent or cure error," a party may assign an evidentiary error on appeal based only on a specific ground made below. *State v. Kirkman*, 159 Wn.2d 918, 926, 115155 P.3d 125 (2007). When Exhibits 1, 2, 4, 6, 7, 8, and 9 were offered, Standley's objections were limited to objecting "to those records that [] Baity hasn't reviewed and hasn't used in her practice" and that the records "very likely include layers of inadmissible hearsay." 1 RP at 106-07. When Standley later objected to the State offering Exhibit 3, he objected on the same grounds. Because Standley failed to include the specific grounds he now argues on appeal in his objection at the trial court, we decline to reach the merits of Standley's conclusion or opinion argument that exhibits also contained unpermitted conclusion or opinion.

In order to lay a foundation for admission of a business record, the statute requires appropriate testimony by a custodian or other qualified witness to establish the record's identity and mode of preparation. RCW 5.45.020. The person—or people—laying the foundation are not required to be those who personally made the records so long as they are someone who, as a regular part of his work, has custody of the record or supervises its creation. *See State v. Quincy*, 122 Wn. App. 395, 399, 95 P.3d 353 (2004).

First, Standley contends that the foundation laid was insufficient because "no one testified that the challenged exhibits were made in the regular course of business, at or near the time of the subjects described in each" and neither a records custodian or "other qualified witness" testified to the records' identity and mode of preparation. Br. of Appellant at 23-24. We disagree.

Allowing the proper admission of hospital records under the business records exception fulfills one of the purposes of the exception: "compliance with [the exception] obviates the necessity, expense, inconvenience and sometimes impossibility of calling as witnesses the attendants, nurses, physicians, X-ray technicians, laboratory and other hospital employees who collaborated to make the hospital record of the patient." *Cantrill v. American Mail Line*, 42 Wn.2d 590, 606-08, 257 P.2d 179 (1953). In *State v. Hopkins*, we acknowledged that medical records could qualify as business records but held that "the State is not excused from laying the appropriate foundation." 134 Wn. App. 780, 789, 142 P.3d 1104 (2006). In *Hopkins*, the State failed to lay adequate foundation for medical reports when a witness failed to testify "how reports were made or whether they were produced in the regular course of business." *Id.* at 789.

Contrary to the witness in *Hopkins*, here witnesses identified the documents as parts of Standley's electronic file at WSH and testified to how the documents fit within WSH's regular course of business. Dr. Young testified that, as a product of his work, he was familiar with and utilized Standley's treatment records including his electronic records. Throughout his testimony, Dr. Young testified to the identity of Exhibits 6, 7, 9, including some dates, and parts of what Exhibit 8 contained.

Baity testified that, as Standley's primary therapist, her responsibilities included communicating with Standley's treatment team, creating and submitting documentation such as the six-month court letters and portions of the privilege petition recommendation packet, completing treatment plan updates and NGRI update, and communicating with other members of "the team to see how they're doing." 1 RP at 102. Through her work, Baity had access to Standley's electronic chart including "anything in the chart that [would] help [her] do [her] job better." 1 RP at 104. When the State presented Baity with all eight of the challenged exhibits to examine, Baity testified that she identified some of the exhibits as part of the WSH's electronic record which she utilizes in the normal course of her work and testified that she recognized the remaining documents as a part of the WSH's electronic chart kept by the hospital in the regular course of its business. Baity also identified the remaining documents as made by Dr. Rao or other people on Standley's treatment team.

After the court admitted the exhibits, Johnson described progress notes as "fundamental" to ensuring the treatment team and others at WSH were aware of the patient's presentation during therapy sessions. 2 RP at 239. Charting progress notes was a required part of Johnson's job.

From the combined testimonies, a reasonable person could have concluded that the testimonies provided adequate foundation for the report's identity, preparation, and place in the hospital's regular course of business. *See Sisouvanh*, 175 Wn.2d at 623.

Baity qualified as an appropriate witness to lay the exhibits' foundation because, as Standley's primary therapist at WSH, she had access to and utilized in the course of her work many of the exhibits contained in Standley's electronic chart. *State v. Garrett*, 76 Wn. App. 719, 723-25, 887 P.2d 488 (1995) (medical records properly admitted through a treating physician who testified to relying on records prepared by fellow physicians in the course of business). While Baity did not directly testify to the timing of the records as they relate to their contents, she testified that all exhibits were part of Standley's WSH electronic chart and that the chart was kept in the regular course of the hospital's business. We afford great weight to the trial court's decision to admit evidence, and find that it was reasonable for the trial court to be satisfied that adequate foundation was laid to justify the admittance of the exhibits. *State v. Ziegler*, 114 Wn.2d 533, 538, 789 P.2d 79 (1990); *M.R.*, 200 Wn.2d at 377.

Next, Standley asserts that the records included another layer of hearsay that the State failed to justify. Standley points only to portions of Exhibits 1 and 4 as records containing layers of hearsay. Thus, we address only those two exhibits.

In Exhibit 1, Standley's treatment team's April 2023 progress report included statements from Dr. Young that Standley's "baseline risk [was] elevated by several present historical factors," his "static risk factors suggest[ed] a moderate long-term risk for violent recidivism," and Standley "ha[d] continued to make significant progress in treatment during the past year." Ex. 1 at PDF 2-3. The exhibit described these statements as conclusions from Dr. Young's

August 2022 forensic risk assessment. Ex. 1 at PDF 2. The admitted exhibits also included two letters of nonsupport from DSHS's secretary designee and signed by Baity and Dr. Rao, or others in similar treatment positions at the time. Ex. 4 at PDF 2. The January 2023 letter included a statement that "[i]t [was] the RRB's recommendation that [] Standley may not be conditionally released, without substantial danger to other persons." Ex. 4 at PDF 3. It also stated that the DSHS secretary designee "believe[d] that [] Standley poses a significant public safety risk and is in need of further oversight from [WSH]." Ex. 4 at PDF 4.

Even if we assume without deciding the trial court erred in admitting these portions of the two exhibits, it is not reasonably probable that, absent any error, the outcome of the trial would have been materially affected. *Barry*, 183 Wn.2d at 303. There is no evidence that the challenged statements contained in the April 2023 progress report and a letter on nonsupport related to a prior SECO request had material impact on the trial court's determination regarding Standley's current request. Identical excerpts from Dr. Young's forensic risk assessments were included in admitted Exhibit 11 to which Standley did not object. Indeed, Standley offered proposed Exhibit 11. Dr. Stanfill also testified that Standley was in the low to low moderate risk range for violent reoffence based on historical factors, so inclusion of that conclusion is not prejudicial to Standley. And it is unclear how Dr. Young's statement that Standley continued to make significant progress leading up to April 2023 would have changed the outcome of the trial when similar statements were made by others at the trial.

Further, the RRB and the DSHS secretary designee's statements in their denial of Standley's prior 2022 SECO request clearly did not materially impact the trial's outcome or otherwise prejudice Standley when the statements are from the same groups that changed their

27

prior position from deny to then support Standley's most recent SECO request. Thus, even if the trial court erred by admitting these exhibits, Standley fails to show prejudice.

Because the trial court did not abuse its discretion in admitting the exhibits under the business records exception and Standley fails to show prejudice in admitting the challenged portions of Exhibits 1 and 4, we hold that the trial court did not err and, even if it did regarding Exhibits 1 and 4, Standley fails to demonstrate prejudice resulting from the admittance of any exhibits.[19]

C.      *The Trial Court Did Not Err in Allowing Johnson to Testify Regarding Standley's Risk to Others*

Standley argues that the trial court erred in allowing Johnson to "suggest[] that a lack of insight into the therapeutic process creates a risk to others" and to estimate Standley's level of risk to others. Br. of Appellant at 32. Specifically, Standley contends that Johnson lacked both the qualifications and a factual basis to provide the two opinions.

Experts qualified by knowledge, skill, experience, training, or education may testify to their opinion if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.[20] ER 702. Expert testimony is admissible under ER 702 if the court determines that (1) the witness qualifies as an expert, and

---

[19] Because we hold that the trial court did not err in submitting the exhibits as business records, Standley's remaining arguments regarding their admission are moot.

[20] In contrast to the *Frye* test, *Frye v. United States*, 54 U.S. App. D.C. 46, 293 F. 1013 (1923), "ER 702 concerns the use of existing scientific methodology and excludes testimony 'where the expert fails to adhere to that reliable methodology.'" *State v. Arndt*, 194 Wn.2d 784, 798, 453 P.3d 696 (2019) (emphasis omitted) (quoting *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918-19, 296 P.3d 860 (2013)).

(2) the testimony will assist the trier of fact. *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019).

We review the trial court's admission of expert testimony for abuse of discretion. *State v. Rivers*, 1 Wn.3d 834, 867, 533 P.3d 410 (2023). Because the trial court's determination is given great weight, we only hold error if the trial court either adopts a view that no reasonable person would take, bases its decision on facts unsupported in the record, or applies an incorrect legal standard in making its determination. *Sisouvanh*, 175 Wn.2d at 623. "Reversal is warranted only where 'no reasonable person would have decided the matter as the trial court did.'" *Rivers*, 1 Wn.3d at 867 (quoting *State v. Thomas*, 150 Wash.2d 821, 856, 83 P.3d 970 (2004).

Johnson testified that Standley was scheduled to attend a group therapy session at least once a day. When Standley returned to group therapy sessions following some absence, Standley told Johnson that he had not been attending sessions because he believed "we had nothing left to offer him [and] he was Level 4 material." 2 RP at 242. According to Johnson, Standley's statements "show[ed] a serious lack of insight as the therapeutic process doesn't simply end once somebody attends some groups. [Standley's condition] is an ongoing serious mental illness that requires serious therapy that doesn't just have a termination date." 2 RP at 243.

When Johnson was asked how the lack of insight related to Standley's risk to others he may come into contact with during SECO or UGP or to safety in the community, Standley objected on the grounds of a lack of foundation showing that Johnson had the expertise to opine about risk. The trial court overruled Standley's objection. The following exchange then occurred:

[PROSECUTOR]      So the lack of insight that you just described for us, how does that relate to [] Standley's risk to other people or to safety in the community for SECO and UGP?

[JOHNSON]      To me it presents -- in my opinion, it presents a risk.

[PROSECUTOR]      Okay. What level of risk, in your view?

[JOHNSON]      Boy, if I have to put a number on it, I would say it's a moderate to high risk, in my -- just in my view. I didn't do the forensic risk assessment, so that's just my opinion.

2 RP at 243.

Standley argues that Johnson was not qualified to provide such opinion because the record did not show that Johnson was an expert in risk assessments specifically. We disagree.

An expert may be qualified based on knowledge, skill, training, education, or experience—even experience alone. *Rivers,* 1 Wn.3d at 868.

Johnson clearly qualified as an expert as one who frequently worked with patients suffering from psychotic mental illnesses, including Standley. Johnson's expertise derived from his education, experience, and knowledge gleamed from interacting daily with NGRI patients, especially those with psychotic mental illnesses. *See Arndt*, 194 Wn.2d at 799; ER 702. Johnson had a master's degree in psychology, was a licensed drug and alcohol counselor and mental health counselor associate, and had a substance use disorder professional certification through the state. Johnson worked at WSH for approximately eight years and spent the last five years out of six specifically working in the NGRI side of the hospital. Johnson led multiple group therapy sessions, including ones that Standley participated.

Johnson estimated that he interacted daily with 30 to 45 NGRI patients, the majority of them having some psychotic disorder. And Johnson's daily work included assessing individuals

within the groups, observing any symptoms they may be exhibiting, and documenting those symptoms. While Johnson did not personally conduct "risk assessments," a reasonable person could have found that Johnson qualified as an expert regarding a patient's awareness and understanding of their therapeutic process and general risk to others due to his educational background, training, and extensive experience working with NGRI patients, including those with psychotic disorders and Standley specifically. Standley contends that Johnson's opinion lacked sufficient factual basis or reliability. However, from the context of Johnson's testimony, a reasonable person could have concluded that Johnson's observations of Standley exhibiting a lack of insight, exhibiting behaviors consistent with paranoia, and Standley's report of feeling anxious provided a factual basis for his opinion, distinct from a speculative one. *See Volk v. DeMeerleer*, 187 Wn.2d 241, 277, 386 P.3d 254 (2016) (testimony based on facts in the record and not speculative is admissible).

And Johnson's testimony would have assisted the trier of fact because Johnson's opinion of Standley's risk of dangerousness was critical to providing a full picture of Standley's likelihood that he would be a danger to the public. When an insanity acquittee petitions the court for conditional release with the secretary of DSHS's recommendation, the question before the trial court is whether there is "substantial evidence" that, under the conditions of the release, the patient would not cause a "substantial danger to other persons, or substantial likelihood of committing criminal acts jeopardizing public safety or security." RCW 10.77.150(3)(c), (d). As Johnson was a treatment professional responsible for a portion of Standley's treatment plan, someone who interacted daily with him, and someone who was responsible for evaluating and documenting any symptoms Standley might be exhibiting in the group sessions, his opinion

whether Johnson demonstrated any risk to the public could have helped the trial court assess Standley's dangerousness and whether any danger could be managed by the request's conditions.

Standley points to no authority requiring only those who have conducted risk assessments to opine on an individual's general risk of danger. Johnson explicitly notified the court that his opinion was not derived following a forensic risk assessment. Any issue with Johnson's opinion related to the fact that it came from observations instead of a risk assessment goes to the opinion's weight, not its admissibility. *See Rivers*, 1 Wn.3d at 869 ("[O]nce basic requisite qualifications are established, any deficiencies in an expert's qualifications go to weight, rather than admissibility of testimony.") (quoting *State v. Flett*, 40 Wn. App. 277, 285, 699 P.2d 774 (1985)); see *also In re Detention of Thorell*, 149 Wn.2d 724, 756, 72 P.3d 708 (2003).

Standley also contends that the State failed to lay proper foundation in showing that Johnson's testimony was based on a generally relied upon methodology. However, Standley provides no support in the record or by authority that observation of an individual during such group therapy sessions is not an adequate factual basis for assessing whether one poses a risk to others due to a demonstrated lack of insight into the therapeutic process. And given Johnson's daily work with NGRI patients, including Standley, a reasonable person could have found that Johnson had sufficient factual basis to opine on any relation between a patient's insight into their therapy and their risk to the public.

We cannot say that no reasonable person would have decided as the trial court did here to allow Johnson's testimony and, thus, we hold that the trial court did not abuse its discretion.

II. SUFFICIENCY OF THE EVIDENCE

Standley argues that insufficient evidence supported nearly all of the trial court's findings of fact, conclusions of law, and the trial court's denial of Standley's petition for SECOs. In doing so, he assigns error to all the trial court's written findings except Findings of Facts 1, 7, 8, and 11.[21]

A.      *Standard of Review*

A trial court's determination that an insanity acquittee is a danger to the public is a question of fact. *State v. Klein*, 156 Wn.2d 102, 121, 124 P.3d 644 (2005). And "we review disputed findings of fact under a substantial evidence standard." *Id.* at 115. Therefore, when an insanity acquittee brings a sufficiency of the evidence claim following the denial of a release petition, "our review is limited to determining whether substantial evidence supports the challenged findings of fact and, in turn, if the supported findings and unchallenged findings support the court's conclusions of law." *See State v. Coleman*, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018); *see also State v. Homan*, 181 Wn.2d 102, 105-106, 330 P.3d 182 (2014) (presenting the substantial evidence standard following a bench trial). If the evidence is "sufficient to persuade a fair-minded person of the truth of the asserted premise," such evidence is substantial. *Id.* at 106. If a finding of fact is supported by substantial evidence, we treat it as a verity as well as any unchallenged findings of fact. *Id*.

We review any challenges to a trial court's conclusions of law de novo. *Id*. To determine whether the trial court made a finding of fact or a conclusion of law, we review the content of the challenged finding, not its labels. *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864,

---

[21] While Standley assigns error to the trial court's FF 19, he makes no argument on the claimed error. Thus, we treat FF 19 as a verity on appeal.

871, 439 P.3d 694 (2019). "'[I]f a determination is made by . . . interpretation of the legal significance of [] the evidentiary facts, it is a conclusion of law.'" *Id.* at 872 (quoting *Goodeill v. Madison Real Est.*, 191 Wn. App. 88, 99, 362 P.3d 302 (2015)).

Further, in sufficiency of the evidence claims, we generally do not review credibility determinations. *State v. Restvedt*, 26 Wn. App. 2d 102, 116, 527 P.3d 171 (2023); *see also State v. Sommerville*, 86 Wn. App. 700, 707, 937 P.2d 1317 (1997). And "[w]e generally do not substitute our judgment with that of the trier of fact regarding issues of conflicting expert testimony." *Klein*, 156 Wn.2d at 121.

B.      *Sufficient Evidence Supported the Trial Court's Findings of Fact*

Standley assigns error to most of the trial court's findings and argues that they included inaccuracies or were "otherwise unsupported." Br. of Appellant at 53.

i.      "*Findings of Fact as to Credibility*"

The court titled the first six findings as "Findings of Fact as to Credibility" (FF 1-6). CP 122. In each of these findings, the trial court determined the credibility of each witness as well as presented what appears to be findings of fact regarding evidence at the hearing to explain its credibility determinations. Generally, in sufficiency of the evidence claims, we do not review credibility determinations. *See State v. Restvedt*, 26 Wn. App. 2d at 116. To the extent that these findings include facts beyond mere credibility determination, we assume without deciding that they are reviewable and the substantial evidence test applies to such findings. *See Coleman*, 6 Wn. App. 2d at 516.

In FF 2, the trial court found Dr. Young's testimony not credible as he "admitted being aware that [Standley] posed a substantial danger to [] Hanniball." CP at 123. Dr. Young

acknowledged that he knew Hanniball "felt threatened" from experiencing Standley presenting with intense anger, so much so that Hanniball moved her and Standley's sessions to a virtual format. This testimony substantially supports the non-credibility determination portion of the trial court's finding. A fair-minded, rational trier of fact could have concluded that Dr. Young at least admitted to being aware that, in that moment, Standley posed a substantial danger to Hanniball as his own notes included reference to the February 2023 interaction.

In FF 2, the trial court additionally found that Dr. Young "acknowledged that [Standley] lacks insight and has a strong and specific motive to not report symptoms" due to his prior denials of privilege increases. CP at 123. Dr. Young testified that Standley lacked insight in the sense of underestimating the severity of his mental health and substance use issue. Dr. Young also recognized that there was a risk that Standley would not report symptoms if he wanted to earn privileges—especially considering Dr. Young's testimony that Standley would have been aware that the February 2022 incident was "a key feature" for why he was previously denied SECO. 1 RP at 47. Substantial evidence supports this non-credibility determination finding as well. A fair-minded, rational trier of fact could have concluded that Dr. Young at least acknowledged that Standley lacked a certain type of insight and was specifically motivated to not report symptoms in order to pursue privilege increases. [22]

In FF 4, in addition to making a credibility determination, the trial court found that Dr. Stanfill was "made aware of a substantial body of contradictory evidence from the progress notes during 2023 [which] called into question his opinion concerning dangerousness." CP at 124.

---

[22] Regarding Standley's challenges to FF 3 that Baity was not credible and to FF 4 that Dr. Stanfill was not credible, Standley's arguments fail as our review does not reach determinations of credibility. *Restvedt*, 26 Wn. App. 2d at 116; *see also Sommerville*, 86 Wn. App. at 707.

During Dr. Stanfill's testimony, he discussed both the February 2023 interaction with Hanniball as well as Johnson's observations of Standley in September 2023. Nevertheless, Dr. Stanfill repeatedly opined that there had been "an objective absence of paranoia" since March 2022. 1 RP at 140. Substantial evidence supports this non-credibility determination portion of FF 4. With the evidence surrounding both the February and March incidents, a fair-minded, rational person could have concluded that Dr. Stanfill certainly was made aware of substantial evidence that Standley experienced symptoms during those times.

In FF 5, in addition to finding Dr. Rau's testimony concerning Standley's behavior and symptoms credible, the court also found that Dr. Rao (1) described Standley as displaying "delusional thinking, and rigid thought processes in response to treatment related to his index offense," (2) observed "lack of insight and increasing symptoms during 2023 which rendered his progress 'fair' but 'not good,'" (3) sanctioned Standley's treatment team's stoppage related to his insight into his index offense and symptoms "out of a concern for her own safety and the safety of other members of the treatment team," and (4) "minimized the importance of reported symptoms in progress notes submitted by [Standley's] other treatment providers." CP at 124. Finally, the trial court noted that, "[c]oncerning paranoid schizophrenia, lack of insight is especially dangerous because it is what enables [Standley] to regulate his disease." CP at 124.

Substantial evidence supported FF 5 beyond the credibility determination. According to Dr. Rao, Standley presented primarily with delusional symptoms, which created rigid behavior and thought processes, in contrast to other schizophrenic symptoms. Dr. Rao testified that patients with delusional symptoms also did not always present their symptoms outwardly and that was one reason why delusions could be dangerous. She explained that a failure to report

symptoms would increase Standley's level of dangerousness "exponentially [] because not reporting those symptoms [could] also speak to a lingering paranoia and potentially worsening paranoia." 2 RP at 200. Combined with Johnson's testimony that Standley appeared guarded when discussing the index offenses as well as Dr. Rao and Hanniball's observation of Standley's angry response when discussing the same, a fair-minded, rational person could have concluded that, by acknowledging that an absence of reporting symptoms could indicate paranoia, Dr. Rao described and acknowledged that Standley was displaying delusional symptoms related to such treatment.

And other aspects of Dr. Rao's testimony supported the other four factual parts of the finding. Dr. Rao testified that, during 2023, Standley had "fair, not good" insight into his own symptoms but poor insight into understanding schizophrenia itself. 2 RP at 202. Both Dr. Rao and Hanniball observed Standley presenting as angry and unable to control his anger when discussing "unpleasant or any challenging topics," such as his index offense in early 2023. 2 RP at 188.

In response to Standley's behavior and because Dr. Rao felt unsafe, she took precautions in her approach in treating Standley, including avoiding discussing "[a]ny topic or any conversation that [Standley] might find challenging." 2 RP at 203. Dr. Rao discussed this change in approach with Standley's treatment team and noted that Hanniball also adopted "a lot" of precautions, including moving to a virtual format, in response to Standley. 2 RP at 204. Standley's treatment subsequently stopped or plateaued.

When Dr. Rao was asked about Johnson's note concerning his observation of paranoia, Dr. Rao stated that the note did not make her particularly concerned. But she also noted that

there is an overlap between the symptoms of schizophrenia and anxiety which Dr. Rao at another point described as relating to one's fight or flight response. Considering Dr. Rao's testimony, substantial evidence supported the non-credibility determination portions of the trial court's FF 5.

In FF 6, the court found Johnson's testimony concerning the 2023 breakthrough symptoms "corroborated by references in the progress notes to [Standley] having displayed symptoms when challenged concerning his index offense." CP at 124. The court also noted how Johnson's "description of [Standley] presenting as guarded" supported Johnson's observation that Standley "was experiencing persistent symptoms of paranoia and lack of insight directly related to the violence which he perpetrated during his index offense." CP at 124, FF 6. The admitted exhibits included Johnson's own progress note regarding his September 2023 observation of Standley experiencing paranoia when discussing the circumstances surrounding his index offense. Other exhibits included notes from Dr. Rao and Hanniball describing Standley as being hostile, angry, and intimidating in response to difficult conversation topics.

Johnson testified that, when Standley began attending the group treatment sessions again after some absence, Standley displayed a "serious lack of insight" as Standley believed that "we had nothing left to offer him" and he deserved a privilege increase. 2 RP at 242-43. During this session, Standley avoided discussing his index offense when prompted and appeared guarded in discussing symptoms. When the February 2022 incident was brought up, Standley described it as an overreaction by the treatment team and that he was not being paranoid but just cautious during the incident. A fair-minded, rational trier of fact could have found Johnson's testimony corroborated by the contents of the admitted exhibits.

38

Additionally, considering Johnson's observation that Standley exhibited guardedness when discussing symptoms early in 2023, a trier of fact could have also concluded that Standley was exhibiting paranoia and a lack of insight prior to Johnson's September 2023 observation. A rational trier of fact could have concluded that the same guardedness Johnson observed in early 2023 was a similar type of concealment Standley used in September when he told Johnson he was experiencing "anxiety" but Johnson concluded it was paranoia. To the extent that Standley challenges the trial court's weighing of the evidence and finding Johnson's testimony corroborated and supported, we defer to the trial court's weighing. *State v. A.X.K.*, 12 Wn. App. 2d 287, 298, 457 P.3d 1222 (2020).

ii. *"Findings of Fact"*

The trial court made multiple findings of fact in a section labeled "Findings of Fact" (FF 9-21) that Standley also challenges on appeal. CP at 125-29.

In FF 9 and 10, the trial court found that Standley was provided, in writing, with "the reasons" for the DSHS's secretary's designee, the RRB, and the PSRP's lack of support for Standley's 2021 and 2022 petitions. CP at 125. The court additionally found that the 2022 notice included a reference to breakthrough symptoms. In FF 12, the trial court described how, upon Standley reporting the 2022 breakthrough symptom incident to staff, "[t]he treatment team concluded that the incident was a serious setback and a primary reason for the rejection of his 2022 petition." CP at 126. The court then repeated that Standley was advised in writing of his 2022 petition's rejection and the reasons for it.

Standley was copied on both letters of nonsupport for his 2021 and 2022 petitions. The letter of nonsupport for Standley's 2022 petition referred in two places to the February 2022

boundary walk incident as a reason for the nonsupport, one being an excerpt from Dr. Young's 2022 forensic risk assessment where he described the incident as Standley experiencing "breakthrough persecutory ideation." Ex. 4 at PDF 3. Dr. Young testified that his report contained references to the incident as including breakthrough symptoms and that, because Standley received copies of the reports and had above average intelligence, Standley would have been aware that the February 2022 incident was "a key feature" for why he was denied SECO. 1 RP at 47. Dr. Young also testified that the breakthrough symptom mirrored that which Standley experienced during his index offense. He further testified that Standley experienced the breakthrough symptom despite taking his treatment medication. Substantial evidence supported the trial court's findings.

In FF 13, the trial court stated that "[p]ersecutory ideation consists of fear and anxiety related to delusional beliefs" and found that Standley "experienced persecutory ideation during the 2022 breakthrough symptom incident." CP at 126. Dr. Young and Dr. Stanfill's testimonies regarding the meaning of persecutory delusional beliefs and Dr. Rao's testimony that paranoid schizophrenia and anxiety overlaps due to paranoid schizophrenia creating a "profound sense of anxiety" support the trial court's description of persecutory ideation. 2 RP at 198. A fair-minded, rational trier of fact could have found that persecutory symptoms consisted of fear and anxiety inherent when one thinks someone is either trying to harm or come after another. Additionally, substantial evidence supported the trial court's finding that Standley's 2022 breakthrough symptoms consisted of persecutory symptoms considering Dr. Young's testimony that the symptoms experienced by Standley during the February 2022 incident were the same symptoms, paranoia and persecutory delusions, experienced by Standley during his index

offenses. Further, in unchallenged FF 11, the trial court found that the 2022 breakthrough symptoms "consisted of a single episode of persecutory ideation." CP at 126. As Standley does not challenge this finding, we treat it as a verity. *Homan*, 181 Wn.2d at 106.

In FF 14, the trial court found that Standley's "lack of reporting of symptoms coincide[d] with [Standley] having developed a strong motive to conceal symptoms" due to his breakthrough symptoms being a reason for the denial of his 2022 petition. CP at 126. The court found that Standley's "concealment of symptoms caused him to be increasingly guarded and to experience anger and the potential for violence during 2023 because he lack[ed] insight into his index offense and the symptoms of paranoid schizophrenia." CP at 126. These findings are supported by substantial evidence. Standley had not reported any symptoms "of any kind" to his treatment team following the 2022 breakthrough incident.[23] CP at 126. As discussed above, various members of Standley's treatment team testified that, after the denial of Standley's 2022 petition, Standley appeared angry and guarded and exhibited a lack of insight when discussing difficult subjects, including the circumstances around his index offense and the symptoms of schizophrenia. Further, Dr. Young testified that Standley had above average intelligence and acknowledged that Standley would have known the reasons of his 2022 request's denial.

A fair-minded, rational person could have concluded as the trial court did, considering Standley had not reported any symptoms since the denial of his 2022 petition despite exhibiting anger and paranoia symptoms at times, that (1) Standley was likely aware that a reason for his denial was the breakthrough incident that he had reported; (2) Standley was motivated to gain

---

[23] Standley did not challenge this finding and, thus, we treat it as a verity. *Homan*, 181 Wn.2d at 106.

increased privileges, both evidenced by his own statements and a reasonable inference from his repeated petitions; and (3) Standley would not have shared any symptoms in order to prevent future rejections of requests for increased privileges. Substantial evidence supports FF 14.

In FF 15, the court found that Baity's "references to the defendant using coping skills contradict[d] that he is symptom-free and indicate[d] that he continue[d] to be symptomatic." CP at 127. The court's findings are a reasonable inference given Baity's testimony and report to the RRB that, despite her observing Standley use coping mechanisms designed to manage symptoms, she contended that she never observed Standley experiencing symptoms. Thus, the finding is supported by substantial evidence.

In FF 16, the trial court found that Standley "displayed symptoms . . . including anger and threatening behavior toward the members of his treatment team" in 2023. CP at 127. The court discussed how Dr. Rao, Hanniball, South, and Johnson all "reported either angry, threatening behavior . . . or that indicated [Standley] was concealing and re-labeling symptoms of persecutory ideation or paranoia." CP at 127. The court also found that Standley's treatment team "adopted safety precautions to protect WSH staff from physical danger posed by [Standley] as a result of symptoms during 2023." CP at 127.

As discussed above, Dr. Rao testified that both she and Hanniball observed Standley exhibiting angry behavior and that their experiences made both feel unsafe and intimidated. Hannibal specifically charted her interaction with Standley as making her feel "threatened by the intensity of [Standley's] anger." 1 RP at 36. Dr. Rao felt similarly to Hanniball and was "fearful for [her] own safety." 2 RP at 190. Additionally, Dr. Young testified that, while Standley described himself as experiencing anxiety, Johnson believed Standley was actually experiencing

paranoia in September of 2023. Further, the admitted exhibits included notes by another member of Standley's treatment team, South, who noted that Standley appeared to be exhibiting paranoia or at least was guarding and deflecting. Substantial evidence supported the trial court's findings.

For FF 17, Standley challenges the trial court's references to breakthrough symptoms that occurred in 2023. However, as discussed above, substantive evidence supported the trial court's conclusion that Standley experienced breakthrough symptoms in 2023.

In FF 18, the trial court found that "[t]he repeated references to [Standley] reporting anxiety, which was regarded as paranoia, indicate[d] that [Standley's] insight and sincerity concerning his treatment [was] lacking." CP at 128. The court also found that Standley was "minimizing and concealing the seriousness and severity of symptoms which [were] the same symptoms that accompanied his index offen[s]e." CP at 128. Considering the evidence before the trial court and the supported findings of fact above, it was a reasonable inference to conclude that Standley only reporting experiencing "anxiety" demonstrated a lack of insight and sincerity in his treatment and that Standley's minimized and concealed the extent of his symptoms.

Dr. Rao explained that treating Standley's illness required Standley's "recognition" that he may experience symptoms even while compliant with medications and being "forthright" in addressing such symptoms. 2 RP at 199. Dr. Rao also testified that recognizing and vigilantly responding to symptoms was a crucial component of managing Standley's schizophrenia, and both she and Dr. Young testified that they relied on Standley to report symptoms. Yet, witnesses provided evidence that Standley was experiencing paranoia symptoms at this time and concealing them as "anxiety." *See* FF6. To the extent that Standley challenges the trial court's weighing of the evidence, we defer to the trial court's weighing. *A.X.K.*, 12 Wn. App. 2d at 298.

In FF 20, the trial court described what UGP consists of and found that "[e]mergency response to a dangerous episode or elopement would necessarily include waiting until the approved UGP time period lapsed, followed by checking the campus area, and only then calling 911 to report the incident." CP at 128. Baity's testimony concerning what UGP privileges entailed in combination with Dr. Rao and Dr. Young's testimony regarding the options available to staff if a patient were to become dangerous or walk off WSH's campus substantially supported the trial court's finding. A fair-minded, rational person could have reasonably inferred that the response options available to the staff if a patient were to walk off the hospital grounds or become dangerous would be as the trial court described.

For FF 21, Standley contends preliminarily that the finding is actually a legal conclusion and, therefore, argues that we must review it de novo. We disagree. In FF 21, the trial court stated:

> The level of care and control proposed for the requested SECO and UGP privileges is insufficient. The reoccurrence of breakthrough symptoms during 2023, and the lack of insight and sincerity on the part of [Standley] in reporting and responding to those symptoms poses a grave danger to other persons and a grave danger that [Standley] will commit criminal acts jeopardizing public safety or security if he is permitted to exercise the requested privileges.

CP at 128-29. FF 21 determined that care and control during SECO and UGP were insufficient because Standley's presentation was "a grave danger" to the public—a determination which is a finding of fact. *See Klein*, 156 Wn.2d at 121 ("The determination that an individual remains a danger to the public is a question of fact."). Standley does not explain why this is a conclusion of law beyond citing to case law defining a conclusion of law as determining the legal significance of underlying facts. *See State v. Stubbs*, 144 Wn. App. 644, 652, 184 P.3d 660 (2008), *rev'd on other grounds*, 170 Wn.2d 117 (2010) ("Passing treatment of an issue or lack of

reasoned argument is insufficient to allow for our meaningful review."); RAP 10.3(a)(6).

Therefore, we review FF 21 as a finding of fact.

Given the supported findings of fact, especially FF 14 through 16 and FF 18 through 20, substantial evidence supported FF 21. Standley continued to experience breakthrough symptoms in 2023, despite Standley not reporting any such symptoms to his treatment team. Standley's reporting of symptoms as anxiety "indicate[d] that [Standley's] insight and sincerity concerning his treatment [was] lacking." CP at 128. Provided Standley's continuing symptoms and lack of treatment insight and sincerity, a fair-minded, rational person could have concluded that Standley would have posed a great danger to the public in light of the limited level of care and control offered by either SECO or UGP privileges—as described in supported FF 19 and 20.

For each of Standley's challenged findings of fact, we hold that substantial evidence supported each challenged finding of fact.

C.   *Sufficient Evidence Supported the Trial Court's Denial of Standley's Request for Staff-Escorted Community Outings and Unescorted Grounds Privileges*

Standley argues that the trial court erred by denying Standley's petition in CL 22-25.

An individual committed following a NGRI acquittal may apply to DSHS for conditional release. RCW 10.77.150; *State v. Reid*, 144 Wn.2d 621, 628, 30 P.3d 465 (2001). The secretary then determines whether reasonable grounds exists to grant the request and, if the secretary approves such request, the acquittee is authorized to submit a petition to the court. RCW 10.77.200(1); *Id*.

When an insanity acquittee petitions the court for conditional release with the secretary of DSHS's recommendation, the trial court may only deny the petition if there is "substantial

evidence" that, under the conditions of the release, the patient would not cause a "substantial danger to other persons, or substantial likelihood of committing criminal acts jeopardizing public safety or security." RCW 10.77.150(3)(c), (d). When the State opposes an application for conditional release, the State bears the burden of introducing substantial evidence, or evidence sufficient to persuade a fair-minded person that, under the proposed conditions, the acquittee would be a substantial danger to the public. *See Sommerville*, 86 Wn. App. at 707; RCW 10.77.150(3)(c), (d). The trial court then weighs the evidence to ascertain which preponderates or is reasonably more credible. *Sommerville*, 86 Wn. App. at 707.

CL 22 found that the findings of fact were established by a preponderance of the evidence and that substantial evidence supported denial of both SECO and UPG privileges. In CL 23, the court also concluded that, under RCW 10.77.150(3)(c), Standley could not be conditionally released at that time for either SECO or UGP privileges because he posed "a substantial danger to other persons and a substantial likelihood of committing criminal acts of violence which would jeopardize public safety or security." CP at 129.

In CL 24, under RCW 10.77.150(3)(d), the court denied the requested SECO "on the basis of substantial evidence" because the secretary's designee and the RRB supported that privilege. CP at 129. The court further found the two bodies' support to be questionable due to the treatment team's bias and thus provided biased public safety opinions and recommendations. In CL 25, the court denied the requested conditional release for SECO and UGP privileges. CP at 130.

As discussed above, each of the trial court's findings of fact are supported by substantial evidence and the few remaining findings of fact are not contested. Considering the supported

No. 59053-1-II

findings of fact and the unchallenged findings of fact, the trial court's findings of fact supported its conclusions of law, including denying Standley's request for increased privileges under the conditions proposed. *See Coleman*, 6 Wn. App. 2d at 516.

CONCLUSION

We affirm the trial court's denial of Standley's petition for partial conditional release.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Cruser, C.J.

Price, J.